No. 89,672

STATE OF KANSAS, *Appellee,* v. DAJUAN WILKERSON, *Appellant.*

(91 P.3d 1181)

Opinion filed June 25, 2004.

*Randall L. Hodgkinson,* deputy appellate defender, argued the cause, and *Sandra Carr,* assistant appellate defender, was with him on the brief for appellant.

*Lesley A. Isherwood,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant DaJuan Wilkerson appeals from his convictions and sentences for first-degree premeditated murder and attempted first-degree premeditated murder.

Wilkerson claims seven errors: (1) admission of evidence of a shootout that occurred 2 days before the charged crimes; (2) admission of evidence of his nickname; (3) questioning of one of his alibi witnesses regarding her silence during a law enforcement interview; (4) wording of instructions and the verdict form; (5) sufficiency of the evidence; (6) cumulative error; and (7) his sentence to 50 years in prison with no opportunity for parole.

The convictions before us arose out of the murder of Damene Lattimore and the attempted murder of Adeana Gibson.

Wilkerson borrowed a car from Donald Simmons, Gibson's stepfather. Simmons knew Wilkerson by his nickname, "Silence,"

which Simmons pronounced "Silas." Two days before the murder, Wilkerson drove the car to Sean Deshazer's house, and he and Deshazer got into an argument that led to an exchange of gunfire. One of the shots fired by Deshazer struck one of the car's doors on the driver's side. Deshazer and Lattimore were friends.

When defendant returned the car to Simmons, he told Simmons that he had been involved in a shootout. Simmons found spent shell casings in his car and disposed of some of them by throwing them on top of a building.

On the night of the murder, according to Gibson's testimony, Lattimore was asleep and Gibson was running a bath about midnight when Gibson heard a knock at the door. She opened it when she recognized Wilkerson waiting outside. She also knew him as "Silence."

Gibson did not know the man with Wilkerson. Wilkerson asked to speak with Lattimore, and Gibson went to the bedroom to tell Lattimore that "Silence" was there to see him. Lattimore merely shook his head in response. As Gibson returned to the living room, the stranger who had accompanied Wilkerson into the house pointed a gun at her and told her to "get on the floor." She lay in the hallway, face down, outside of the bedroom.

Wilkerson then entered the bedroom and pointed a gun at Lattimore. He asked Lattimore: "Why is your homeboy shooting at me?" Lattimore replied: "Man, I don't know. I don't have nothing to do with that." The light in the bedroom went off, and Wilkerson fired. He then turned the light back on and again asked Lattimore: "Why your homeboys keep on tripping with me? He keeps on shooting at me." Lattimore again replied: "I don't have nothing to do with that. That's on them. Me and you already talked about this. I'm not in that."

According to Gibson, Lattimore then offered Wilkerson money. Wilkerson said Lattimore "would have to kick in more than that" and told Lattimore to "give up his homeboy." Wilkerson then said: "Oh man, did I hit you?" Lattimore said he had been hit and then pleaded: "Please don't shoot me." Wilkerson said: "That's all right 'cause I don't . . . fuck with no slob ass niggers no way." Wilkerson then shot Lattimore three more times.

As Wilkerson walked by Gibson on his way out of the house, he fired two shots at her. One grazed her head, and another went through her left wrist. Gibson pretended to be dead so that he would not fire again. Then, after Wilkerson and his accomplice left, she called 911. It was eventually determined that Lattimore had suffered four gunshot wounds before he died, three in the abdomen and one in the head.

At the time of the crimes, Simmons happened to be visiting a house across the street from Gibson's. Someone else with Simmons heard the gunshots. As police arrived in the neighborhood to respond to Gibson's 911 call, Simmons and two friends got into his car to leave. They were stopped when a police officer noticed the bullet hole in the door of Simmons' car, and Simmons was questioned. Simmons told police that he had lent his car to "Silas" and that the bullet hole had resulted from a shootout in which Silas was involved. When an officer presented Simmons with a picture of a man named Silas, Simmons said that was not the person to whom he had lent his car. Eventually, Simmons was shown a picture of Wilkerson, and Simmons identified him as the man who borrowed his car. During trial, Simmons would eventually identify Wilkerson as "Silas."

Gibson also was questioned the night of the murder. At first, she said she was unable to identify the shooter, but she later identified Wilkerson. She said she had not immediately identified him because she was frightened.

After Simmons was questioned, police retrieved two spent shell casings and one bullet fragment from the roof of the building where Simmons had thrown the spent casings he had found in his car. Police also retrieved a spent casing from the floorboard of the car and three partial bullets and one spent casing from Deshazer's yard. Testimony at trial linked the gun used at Deshazer's house and the murder weapon, a .45 caliber semiautomatic. A tray of ammunition designed to hold 50 rounds for such a gun was found in a search of the house where Wilkerson was staying at the time of the murder; nine rounds were missing from the tray.

Wilkerson's defense was alibi. According to his ex-girlfriend, Nicole Lane, and her family, he was with Lane, their three children,

and her parents from approximately 10 p.m. until 1:30 a.m. on the night of the crimes. Wilkerson first accompanied them to a gas station, then to Wal-Mart, and then to Lane's residence, where he stayed while Lane packed her belongings into her parents' car. Wilkerson then led Lane and her family to the highway, and they departed without Wilkerson for Muskogee, Oklahoma.

At trial, the following exchange occurred between the prosecutor and Lane:

"State:     That's Detective Otis. Remember when he came down to Muskogee back in November of last year?
"Lane:      Mm-hmm.
"Defense:   Objection . . .
"Court:     Overruled.
"State:     You do remember that?
"Lane:      Yes.
"State:     He told you he wanted to talk to you about a murder that had concern — that had occurred here on September 12th?
"Lane:      Yes.
"State:     . . . you wouldn't talk to him?
"Lane:      Yes.
"Defense:   Objection . . .
"Court:     Grounds?""

An off-the-record discussion followed at the bench. Then the prosecutor continued:

"State:     Like I was saying, you knew he wanted to talk to you about a murder possibly involving [defendant], and you refused to talk to him, correct?
"Lane:      Yes."

The prosecutor later asked Lane when she first became aware she would have to testify about her whereabouts on the night of the murder, and she responded that she knew after defendant first went to court. She also replied that she became aware of the investigation when Otis first questioned her.

The jury charge included Instruction No. 14, which read:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty until you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of any of the claims required to be proved by the State, you should find the defendant guilty."

The defense objected to the use of the word "until" rather than "unless" in the first paragraph of the instruction. It also objected to the instructions' reference to Wilkerson as "defendant" rather than by his name and to the verdict form's listing of the "guilty" option before the "not guilty" option.

### Admission of Evidence of Shootout

Wilkerson's challenges to admission of the evidence of his shootout with Deshazer have varied over time.

Before and during trial he focused primarily on persuading the judge that any evidence of the shootout could be admitted only under K.S.A. 60-455 and thus would require a limiting instruction consistent with that statute. Although the judge did not accept the argument that K.S.A. 60-455 applied and admitted the evidence independent of it, he invited the defense to submit a limiting instruction of its own design for his consideration. The defense did not do so.

In his appellate brief, Wilkerson argued that the evidence should not have been admitted because it "1) does not *directly* establish the crime charged as required by the 'other crimes' rule, and 2) the prejudicial effect of this evidence outweighed, by far, any probative value the unreliable testimony of Sean Deshazer may have possessed." The probative value/prejudicial effect balance echoes the third factor in evaluating K.S.A. 60-455 evidence, see *State v. McHenry,* 276 Kan. 513, 519, 78 P.3d 403 (2003), as well as other relevant evidence, see K.S.A. 60-422.

Finally, at oral argument before this court, Wilkerson's counsel resurrected the K.S.A. 60-455 argument, asserting that the shootout evidence could have been admitted only if accompanied by an instruction limiting its consideration for the purpose of proving motive or identity, *i.e.,* that Wilkerson had a motive to kill Lattimore because of his shootout with Lattimore's friend or that the

gun Wilkerson used in the shootout was the same gun used by Lattimore's killer.

We first address Wilkerson's K.S.A. 60-455 argument. The statute provides in pertinent part:

"[E]vidence that a person committed a crime or civil wrong on a specified occasion . . . is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion, but . . . such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

The State insists that Wilkerson waived or abandoned his argument based on this statute by failing to submit a proposed limiting instruction to the district judge and by failing to argue the issue sufficiently in his appellate brief. We are satisfied that Wilkerson has done what is necessary both at trial and on appeal to require us to address the issue.

Many previous cases have held that, when evidence is admitted by the prosecution in a criminal trial to demonstrate one of the material facts listed in K.S.A. 60-455, a limiting instruction must be given to guard against the jury's use of the evidence merely to demonstrate the defendant's propensity to engage in criminal behavior. See, *e.g.*, *State v. Denney*, 258 Kan. 437, 443, 905 P.2d 657 (1995); *State v. Whitehead*, 226 Kan. 719, 722, 602 P.2d 1263 (1979); *State v. Bly*, 215 Kan. 168, 176, 523 P.2d 397 (1974). On appeal, we review a district judge's performance of the analysis necessitated by the statute on an abuse of discretion standard. See, *e.g.*, *McHenry*, 276 Kan. at 519; *State v. Higgenbotham*, 271 Kan. 582, 588-89, 23 P.3d 874 (2001).

Here, we agree with Wilkerson that evidence of the shootout was relevant to demonstrate motive and identity, but it was also relevant to explain the tit-for-tat sequence of events leading to the murder, the pattern and reliability of the police investigation, and the history of the parties' relationship, particularly the context for the killer's statements to Lattimore about his "homeboys." The evidence also bolstered the credibility of Gibson's eventual identification of Wilkerson as the shooter; it demonstrated that she had

heard from his own mouth and seen a demonstration of his willingness to avenge betrayal, making her hesitant to identify him.

Under all of these circumstances, we see no abuse of discretion in the district court's decision that the shootout evidence could be admitted independent of K.S.A. 60-455. In addition, although the better practice may have been to give a modified limiting instruction — one that cautioned the jury not to use the evidence to demonstrate propensity but allowed it to use the evidence for other purposes, including but not limited to motive and identity — we see no error in failing to give such an instruction on the unique facts presented here. The shootout evidence was so interwoven with the commission of the charged crimes and with the investigation leading to Wilkerson's apprehension that we see little or no chance the jury would have relied on that evidence only to demonstrate his general propensity toward criminality.

We next address Wilkerson's argument regarding the "other crimes" rule. The rule is derived from our decisions in *State v. Schlicher*, 230 Kan. 482, 490, 639 P.2 467 (1982); *State v. Holt*, 228 Kan. 16, 21, 612 P.2d 570 (1980); and *State v. Solem*, 220 Kan. 471, Syl. ¶ 3, 552 P.2d 951 (1976). It states simply: "Evidence which is otherwise relevant in a criminal action is not rendered inadmissible because it may disclose another or independent offense." *Solem*, 220 Kan. 471, Syl. ¶ 3. Moreover, "evidence which has a direct bearing on and relation to commission of an offense is admissible without a limiting instruction." *Solem*, 220 Kan. at 476 (citing *State v. Martin*, 208 Kan. 950, Syl. ¶ 2, 495 P. 2d 89 [1972]).

In *Solem*, we upheld a district court's admission of a prior uncharged offer to sell drugs attributed to defendant. We said:

"In the instant case the record discloses continuing contacts related to drugs, between the agents of the attorney general's office and defendant. The statement attributed to defendant tended to prove those contacts existed and eventually led to the transaction which resulted in defendant's arrest. Defendant's prior offer to sell the drugs was relevant and material to his ultimate sale of drugs to the agent. As stated in *Martin*, the fact the questioned evidence related to a prior crime . . . does not prohibit its introduction to show commission of the offense charged." *Solem*, 220 Kan. at 476.

In *Holt*, which Wilkerson urges us to overrule, we upheld the admission of evidence that the defendant had threatened one in-

dividual with a gun sometime prior to shooting a second individual with the same gun. There, we said:

"This evidence was not offered under K.S.A. 60-455 to prove motive or any of the other factors listed in that statute, nor was it introduced in rebuttal to evidence of defendant's good character. It was offered to show that defendant had the alleged murder weapon in his possession prior to the killing with which he was charged. As such it was relevant for a purpose independent of K.S.A. 60-455, and thus the criteria of that statute are inapplicable and no § 455 limiting instruction is required." *Holt*, 228 Kan. at 21.

Finally, in *Schlicher*, we upheld the admission of incriminating statements alleged to have been made by the defendant long after the charged crime, even though an explanation of their context revealed other criminal activity he had engaged in. We said:

"As pointed out in *State v. Martin,* . . . the admissibility of evidence tending directly to establish a crime is not destroyed because it discloses the commission of another and separate offense. . . . In each instance, the testimony about other crimes was admissible to show the background and circumstances present when the defendant made damaging admissions which connected him with the commission of the [charged] homicide. The admissions themselves were clearly relevant and admissible to show the defendant had particular knowledge about the circumstances of the crime and his participation therein." *Schlicher*, 230 Kan. at 490.

A version of the rule of these cases has now found its way into the Comment to PIK Crim. 3d 52.06, which states: "Evidence tending *directly* to establish the crime charged is not rendered inadmissible because it discloses the commission of another and separate offense." (Emphasis added.) PIK Crim. 3d 52.06, Comment III B(6).

Wilkerson focuses his argument on the word "directly." The "other crimes" rule cannot apply to him, he contends, because the shootout evidence only circumstantially linked him to the murder and was more prejudicial than probative. He also insists that Deshazer's credibility was highly questionable.

Where evidence is admissible independent of K.S.A. 60-455, the primary test for its admission is its relevance to an issue in question. *State v. Wimbley*, 271 Kan. 843, 853, 26 P.3d 657 (2001). Further, "[t]he admission of evidence independent of K.S.A. 60-455 is entrusted to the sound discretion of the trial court and will not be

overturned absent a clear showing of abuse of discretion." *State v. Deal*, 271 Kan. 483, 501, 23 P.3d 840 (2001).

A review of our cases persuades us that the inclusion of the word "directly" in the "other crimes" rule is misleading. In fact, direct evidence of the crime charged is not required. We have held that circumstantial evidence linking a defendant to a murder weapon, the modus operandi of the crime charged, or the victim is admissible under the rule. See *Holt*, 228 Kan. at 21 (evidence defendant brandished gun similar to murder weapon before murder admissible to show possession); *State v. Mack*, 255 Kan. 21, 29-30, 871 P.2d 1265 (1994) (evidence of "logically connected" similar incident admissible when same gun used in both shootings); *Deal*, 271 Kan. 483 (evidence of defendant's earlier threats admissible to show rocky relationship with victim).

To the extent the shootout evidence was circumstantial rather than direct evidence against Wilkerson, the distinction is of no moment. We agree with the State that the district court did not abuse its discretion in admitting this relevant evidence, which had a "tendency in reason" to prove several material facts. *State v. Lietner*, 272 Kan. 398, 412, 34 P.3d 42 (2001) (defining relevant evidence). *Cf. State v. Coburn*, 32 Kan. App. 2d 657, 671, 87 P.3d 348, 360 (2004) (Johnson, J., concurring) (difficult to distinguish evidence to prove "some other material fact" under K.S.A. 60-455 from evidence admissible independently for its "direct bearing on and relation to" commission of charged offense).

Finally, we also agree with the State that the district court struck a sound balance between the probative value and the prejudicial effect of the evidence. It was reasonable to conclude that the evidence was highly probative. In contrast, the relative blameworthiness of the shootout and the charged crimes made undue prejudice unlikely.

Wilkerson's argument regarding Deshazer's credibility is addressed to the wrong decision-making body. It is not this court's function to weigh witness credibility. See *State v. Moore*, 269 Kan. 27, 30, 4 P.3d 1141 (2000).

### Defendant's Nickname

Wilkerson next challenges the State's introduction of his nickname, asserting it placed gang association evidence before the jury.

Wilkerson's argument has no support in the record or in logic. During a pretrial motions hearing, the State acknowledged that gang evidence had no relevance, and it scrupulously avoided making any connection between Wilkerson's nickname and gang affiliation or activity. The nickname was never referred to as a gang or street name, and the nickname itself disclosed no such connection or character. There was no error in permitting the prosecution to introduce evidence of the nickname as part of Simmons' and Gibson's versions of pertinent events.

### *Questions Regarding Witness' Prior Refusal to Speak*

Wilkerson also takes issue with the prosecutor's questions about Lane's pretrial refusal to speak to police. He asserts the questions violated *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), relying on the Court of Appeals' application of *Doyle* in *State v. Hazley*, 28 Kan. App. 2d 664, 670, 19 P.3d 800 (2001) ("no meaningful analytical distinction between prosecutorial comment on . . . silence when the defendant has chosen to invoke his or her Fifth Amendment privilege against self-incrimination and such silence when the defendant's sole witness has relied on the same privilege").

*Doyle* and *Hazley* are distinguishable. The record in this case does not indicate that Lane was ever in custody or that she ever received *Miranda* warnings before refusing to talk to investigators. As the Court of Appeals recognized in *Hazley,* it is the administration of *Miranda* warnings that sets up a *Doyle* violation; the warnings imply that a person's invocation of his or her right to silence will carry no penalty, and a later breach of that bargain at trial offends due process. *Doyle* involved a defendant's refusal to speak after *Miranda. Hazley* involved the sole defense witness' identical behavior. Lane was not the defendant and was not Wilkerson's sole witness. She was not even his sole alibi witness.

In contrast to the *Doyle* and *Hazley* limits on proper witness examination, evidence of bias "may always be shown in order to place the witness' testimony in proper perspective. [Citation omitted.]" *State v. Abu-Fakher*, 274 Kan. 584, 600-01, 56 P.3d 166 (2002). Here, the prosecutor's questioning of Lane about her ear-

lier refusal to speak was designed to highlight her probable bias. No error resulted.

## Jury Instructions and Verdict Form

Wilkerson next argues that Instruction No. 14 and other instructions and the verdict form were fundamentally unfair. Specifically, he claims Instruction No. 14's use of the phrase, *"until you are convinced* from the evidence that he is guilty," misled the "jury into believing that they should expect to be convinced of the defendant's guilt." In Wilkerson's view, the word "unless" should have been substituted for the word "until," because " 'until' implies an expectation of a future event or occurrence which *shall* happen. 'Unless' implies a future event or occurrence which *may* happen." (Emphasis added.) In addition to making this definitional distinction, Wilkerson points to *State v. Hundley,* 236 Kan. 461, 693 P.2d 475 (1985), in which this court reversed a conviction and remanded a case for a new trial because the self-defense instruction had used the word "immediate" rather than "imminent."

We agree with Wilkerson that Instruction No. 14 and PIK Crim. 3d instruction 52.02, which it follows, would have been improved by the substitution of the word "unless" for the word "until." However, we do not believe our agreement requires reversal. The whole of the instructions given in this case, when read together, accurately stated the law. The jury could not reasonably have been misled by them, and thus the instructions did not constitute reversible error even if they were in some way erroneous. *State v. Peterson,* 273 Kan. 217, 221, 42 P.3d 137 (2002); see also *State v. Jones,* No. 89,293, unpublished opinion filed Oct. 17, 2003, *rev. denied* 277 Kan. 926 ("until" rather than "unless" in jury instruction not reversible error when instructions, read as a whole, could not have misled jury on allocation of burden of proof).

Wilkerson also challenges other jury instructions, claiming they dehumanized him because they referred to him as "defendant" rather than by given name. His challenge to the verdict form focuses on its listing of the "guilty" option before the "not guilty" option.

PIK instructions do not require the use of a criminal defendant's name and use of PIK instructions generally is recommended. See *Kleypas*, 272 Kan. 894, 1035, 40 P.3d 139 (2001). In addition, this court has approved a similar verdict form. See *State v. Wesson*, 247 Kan. 639, 652, 802 P.2d 574 (1990), *cert. denied* 501 U.S. 1236 (1991) (where guilty blank preceded not guilty blank, no prejudice to accused). Wilkerson was not prejudiced by the instructions referring to him as defendant, nor by the order of the jury's options on the verdict form.

## Sufficiency of the Evidence

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003).

Wilkerson's sufficiency argument questions the credibility of Gibson. Again, this court does not reweigh a jury's determination of the credibility of a witness. See *State v. Moore*, 269 Kan. 27, 30, 4 P.3d 1141 (2000).

When the evidence in this case is viewed in the light most favorable to the prosecution, we see ample proof that (1) Wilkerson was involved in a shootout with a friend of Lattimore shortly before Lattimore's murder; (2) The same gun used during the shootout was used to commit the murder; (3) Gibson testified that the murderer talked to Lattimore about his "homeboys" shooting at the murderer; (4) Gibson identified Wilkerson as the murderer; and (5) Bullets fired at the murder scene matched the type of bullets found at the place where Wilkerson was staying. We have no trouble concluding that a rational factfinder could have found Wilkerson guilty beyond a reasonable doubt.

## Cumulative Error

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule,

however, if the evidence is overwhelming against the defendant.' [Citation omitted.]" *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 (2001).

For the reasons stated above, there was no error to be termed "cumulative."

### Hard 50 Sentence

Wilkerson received a hard 50 sentence pursuant to K.S.A. 2003 Supp. 21-4638, because he "knowingly or purposely killed or created a great risk of death to more than one person" and "committed the crime in an especially . . . cruel manner."

"The constitutionality of a statute is a question of law over which this court has unlimited review." *State v. Beard*, 274 Kan. 181, Syl. ¶ 1, 49 P.3d 492 (2002).

Wilkerson asks this court to revisit *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), in which we upheld a hard 40 sentence as constitutional. See *Conley*, 270 Kan. at 36. He relies on several recent United States Supreme Court cases. See *Ring v. Arizona*, 536 U.S. 584, 589, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 494, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000); and *Jones v. United States*, 526 U.S. 227, 243, 143 L. Ed.2d 311, 119 S. Ct. 1215 (1999). We have already considered these cases and nevertheless upheld the hard 50 sentence as constitutional. See, *e.g.*, *State v. Hebert*, 277 Kan. 61, 108, 82 P.3d 470 (2004); *State v. Boldridge*, 274 Kan. 795, 812, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003). We therefore reject Wilkerson's challenge to his sentence.

Affirmed.