NOT DESIGNATED FOR PUBLICATION

No. 112,439

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JAMES R. QUINTON,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed November 25, 2015. Reversed and remanded with directions.

*Shannon S. Crane*, of Hutchinson, for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., STANDRIDGE and POWELL, JJ.

*Per Curiam*:  James R. Quinton was convicted by a jury of one count of rape and two counts of aggravated criminal sodomy. Following an unsuccessful direct appeal, Quinton submitted a timely motion under K.S.A. 60-1507, arguing ineffective assistance of both trial and appellate counsel. After conducting an evidentiary hearing, the trial court denied Quinton's motion. Quinton now appeals, arguing that the trial court erred because his defense counsel was ineffective: (1) by encouraging him to reject the State's plea offer; (2) by failing to object to and request redaction of Quinton's video statement; (3) by improperly eliciting testimony regarding plea negotiations and conceding guilt in opening and closing statements; (4) by failing to conduct an investigation before trial; and (5) by

1

not raising and preserving additional facts about the victim when requesting an independent evaluation of the victim. In addition, Quinton contends that because defense counsel committed cumulative errors, he was denied a fair trial.

We hold that defense counsel below rendered ineffective assistance of counsel in neglecting to request redaction of prejudicial information in the VHS videotape recording of Quinton's interview played to the jurors and in not requesting a limiting instruction as to how the jurors could use such evidence. Further, we hold that defense counsel committed other errors which we discuss below. We hold that the cumulative nature of the errors resulted in reversible error. As a result, we reverse Quinton's convictions and remand for a new trial.

In September 2003, Quinton and the victim, K.L.R., lived together in an apartment in Reno County, Kansas. They had been involved in a relationship for over a year, and it was violent at times. K.L.R. testified that Quinton once slammed her head against a door while the two were arguing, and she required stitches for a gash above her left eye.

On the night of September 17, 2003, following a lengthy argument, Quinton told K.L.R. he was going to a friend's house to get marijuana. K.L.R. became angry because she believed from past experience that Quinton was going out to use crack cocaine. After Quinton left, K.L.R. used lipstick and a yellow tablet to write notes that said "fuck you" and "go back to where you were"; she hung these notes on the outside doors of the apartment. K.L.R. then locked the doors and went to bed.

Quinton returned to the apartment at approximately 2 a.m. and began pounding on the front door. K.L.R. let him in, and the two engaged in a heated argument. Eventually Quinton took a shower, and K.L.R. returned to bed.

2

Between 2:30 and 3 a.m., Quinton exited the shower and, still naked, laid down on the bed next to K.L.R. The two resumed their argument. K.L.R. got out of bed, put on a bra, pants, shoes, and a jacket, and prepared to leave the apartment. Quinton yelled at K.L.R., prompting K.L.R. to throw two bananas at Quinton as he lay on the bed. Quinton allegedly got out of the bed and allegedly attacked K.L.R. from behind as she tried to leave the apartment. She testified that her feet left the ground as he shoved her face-first into a wall. He kicked her in the stomach, shoved her against the dryer, and pulled her into the bedroom by her hair. Quinton allegedly told her to get on the bed; she complied, and Quinton choked her with both of his hands and slammed her head against the headboard of the bed.

Quinton eventually released his grip and told K.L.R. to take her clothes off. She complied except for her bra, prompting Quinton to yank off her bra. Quinton then returned to the living room for a few minutes while K.L.R. wept while lying on the bed. Quinton allegedly told her that if she tried to leave and contact the police, he would kill her. Quinton eventually returned to the bedroom and told K.L.R. that she needed to apologize to him and prove to him that she was sorry. He lay on the bed next to K.L.R. and repeatedly told her to put his penis in her mouth. She told him no but eventually acquiesced.

K.L.R. testified that she cried during the time Quinton's penis was in her mouth; she eventually asked him if she could get up and blow her nose. Quinton agreed but warned her not to try to escape. While K.L.R. was in the bathroom blowing her nose, Quinton told her to bring lotion. Based on previous experience, K.L.R. believed Quinton wanted to have anal sex with her. She told him no but eventually brought the lotion to the bedroom at his insistence. When she returned to the bedroom, Quinton told her to put his penis back in her mouth; K.L.R. complied.

3

Next, K.L.R. testified that Quinton told her to "get herself ready," which K.L.R. knew to mean he wanted her to put lotion on her anal area. She cried and repeatedly told him no. Quinton threatened to "do it without the lotion" if she did not comply; K.L.R. used the lotion on her anal area while crying. Quinton stood up beside the bed and told K.L.R. to put lotion on his penis and turn around with her knees on the bed; she complied.

K.L.R. testified that Quinton put his hands on her shoulders and pushed her down as she faced away from him. He inserted his penis into her vagina. She kept telling him no. He penetrated her vagina twice. She stated that Quinton next inserted his penis in her rectum until she cried out in pain and pulled forward, causing his penis to exit her rectum. Quinton stared at her for a moment before he left the bedroom. At no time did Quinton ejaculate. K.L.R. crawled onto the floor and wrapped herself in a blanket. Quinton returned to the room multiple times to check on her; he allegedly threatened to kill her if she contacted the police.

K.L.R. stated that Quinton fell asleep in the living room at approximately 4 a.m. Over the course of 30 minutes, K.L.R. slowly pried the screen off the window in the bedroom. She propped the window open with one of Quinton's shoes, got dressed, and left the apartment through the bedroom window. Once outside the apartment, K.L.R. removed her white t-shirt and left it on the ground because she was afraid Quinton would easily see her wearing it. K.L.R. put on her jacket, reached through the open bedroom window, and pulled the curtain back to conceal that she had left the apartment.

K.L.R. went to a nearby Pic-Quik on foot and called 911 from a payphone. She then called her parents and asked them to pick her up. Officers arrived at the Pic-Quik and asked her what had happened. Officer Lee Ann Campbell convinced K.L.R. to furnish details about the situation. Campbell saw that K.L.R. had abrasions on her face and redness around her neck.

4

Campbell and other officers drove to the apartment. They saw that the bedroom window screen was pushed out and that the window was propped open with a shoe. They also saw a white t-shirt on the ground outside the window. The officers searched the apartment with Quinton's permission; they saw K.L.R.'s lipstick signs, the bananas on the bed, the lotion next to the bed, and K.L.R.'s bra with a bent clasp. The officers arrested Quinton.

Meanwhile, a sexual assault examination was conducted on K.L.R. She had redness on her upper chest and trunk area, a recent abrasion on her hymen consistent with rear penetration, and recent bruising and redness on her anus.

A jury convicted Quinton of one count of rape and two counts of aggravated criminal sodomy. Quinton's defense at trial was that he was innocent and that any contact between himself and the victim the night of the incident was consensual. The trial court sentenced him to 618 months' imprisonment for the rape conviction and 123 months' imprisonment for each aggravated criminal sodomy conviction, all to run consecutively for a controlling term of 864 months.

Quinton raised six issues in his unsuccessful direct appeal: "(1) whether the trial court improperly denied an independent psychological evaluation of K.L.R.; (2) whether the State violated an order in limine; (3) whether the trial court improperly admitted improper statements made during a police interview with Quinton; (4) whether the trial court erred in admitting repetitive and cumulative testimony; (5) whether cumulative errors were made; and (6) whether the trial court sentenced Quinton in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)." *State v. Quinton*, No. 93,538, 2007 WL 805999, at *1 (Kan. App.) (unpublished opinion), *rev. denied* 284 Kan. 950 (2007).

Following his direct appeal, Quinton filed the present motion under K.S.A. 60-1507 on August 7, 2008. In the motion, he argued that his trial and appellate counsel were ineffective. Following a hearing held on Quinton's motion in which the trial court permitted Quinton to orally amend his motion through the inclusion of an additional issue, Quinton and the State each provided the trial court with briefs supporting their respective positions. Quinton's brief argued that his trial counsel was ineffective (1) in Quinton's plea negotiations, (2) in failing to object to and request redaction of Quinton's videotaped statement, (3) in improperly eliciting testimony regarding plea negotiations and conceding guilt in opening and closing statements, and (4) in failing to conduct an investigation before trial. Further, Quinton's brief argued that both his trial and appellate counsel were ineffective for failing to raise and preserve issues for appellate review relating to use of evidence of prior bad acts. The trial court denied Quinton's motion in a journal entry filed on April 10, 2014.

*Standard of Review*

A trial court has three options when reviewing a K.S.A. 60-1507 motion:

"(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing." *Fischer v. State*, 296 Kan. 808, 822-23, 295 P.3d 560 (2013).

Because the trial court appointed counsel to represent Quinton and held an evidentiary hearing at which Quinton testified, we apply a mixed standard of review. The trial court's findings of fact are reviewed to assure they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. *Holmes*

6

*v. State*, 292 Kan. 271, 274, 252 P.3d 573 (2011). The trial court's legal conclusions, including whether Quinton's counsel was ineffective, are subject to de novo review. See *Bellamy v. State*, 285 Kan. 346, 355, 172 P.3d 10 (2007).

"The right to effective assistance of counsel arises from the Sixth Amendment to the United States Constitution, which guarantees in 'all criminal prosecutions' that 'the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense.'" *Edgar v. State*, 294 Kan. 828, 837, 283 P.3d 152 (2012). To establish ineffective assistance of counsel, it is not enough merely "to surmise, with the benefit of hindsight, that another attorney might have tried the case differently." *Harris v. State*, 288 Kan. 414, 416, 204 P.3d 557 (2009).

> "To support a claim of ineffective assistance of counsel based on counsel's performance, a defendant must demonstrate that (1) counsel's performance was deficient and (2) counsel's deficient performance was sufficiently serious to prejudice the defense and deprive the defendant of a fair trial. . . .
>
>      . . . .
>
> "'The first prong of the test for ineffective assistance of counsel requires a defendant to show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. [There is] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation omitted.]
>
> "'[Under the second prong of the test for ineffective assistance of counsel], the defendant also must establish prejudice by showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the

7

totality of the evidence before the judge or jury. [Citation omitted.]'" *Edgar*, 294 Kan. at 837-38 (quoting *Bledsoe v. State*, 283 Kan. 81, 90-91, 150 P.3d 868 [2007]).

*The VHS Interview*

Quinton contends that defense counsel below rendered prejudicially ineffective assistance of counsel (1) by failing to request redaction of the recorded interview of Quinton in which there were numerous references to Quinton's drug use, which included a discussion between Quinton and Officer Robert D. McClarty about Quinton's past and present use of crack cocaine and his possible drug usage during the evening of the alleged incident; (2) by failing to request redaction of the remarks made by Officer McClarty vouching for K.L.R.'s credibility and her version of the alleged incident; (3) by failing to request redaction of references to Quinton's criminal record; (4) by failing to request redaction of remarks made by Officer McClarty implying that Quinton was lying; (5) by failing to request redaction of Quinton's comment that he was nervous talking to Officer McClarty without an attorney being present; and (6) by failing to request an instruction limiting the purposes for which the jury could use Officer McClarty's remarks and comments about K.L.R.'s statements and the evidence.

*Quinton's Drug Usage*

The VHS videotape played for the jury by the prosecutor was an approximately 60-minute excerpt of a police interview of Quinton done in 2003. In the course of that videotaped interview, Officer McClarty made several remarks that related to Quinton's drug usage. For reasons unknown, the videotaped interview was not transcribed. Therefore, the following statements have been paraphrased to the best of our ability. The jury heard the following paraphrased statements of Officer McClarty in this category:

8

- From everything I know, and what I have been told that you were slipping out (the night of the alleged incident) to hit the pipe (slang phrase for crack cocaine).
- She (K.L.R.) didn't say you hit the pipe. I am just saying from what I know about the situation so far, that was a possibility. That is why I am asking you about this.
- She (K.L.R.) got every right to believe that maybe he (Quinton) is slipping out to hit the pipe.
- You use to hit the pipe . . . Okay, for if you use to hit the pipe, you taking off at 11:30 at night, she probably has a reason to believe that this is a possibility what's going on, right?
- She thinks you going to hit the pipe.

The jury was permitted to consider, for any purpose, these highly prejudicial and possibly untrue hearsay statements about Quinton's drug usage that had no basis in the record. Moreover, drug usage is subject to the restrictions of K.S.A. 60-455. See *State v. Adams*, 294 Kan. 171, 183-84, 273 P.3d. 718 (2012). Counsel's failure to request the court to redact these unsupported statements of fact when presenting the video to the jury amounts to deficient performance.

Unless prohibited by statute, constitutional provision, or court decision, all relevant evidence is admissible. Evidence is relevant if it has any tendency in reason to prove any material fact. To establish relevance, there must be some material or logical connection between the asserted facts and the inference or result they are intended to establish. K.S.A. 60-455 states:

"(a) [E]vidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis

9

for an inference that the person committed another crime or civil wrong on another specified occasion.

(b) Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Under the plain and unambiguous language of the statute, evidence of prior crimes or civil wrongs cannot be admitted to prove a criminal defendant's propensity to commit the charged crime, but it can be "admissible when relevant to prove some other material fact." K.S.A. 60-455. In *State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006), our Supreme Court stated that before K.S.A. 60-455 evidence can be admitted, the trial judge must determine that it is relevant to prove one of the eight material facts listed in the statute, that the material fact is disputed, and that the probative value of the evidence outweighs its potential for producing undue prejudice. See *State v. Drennan*, 278 Kan. 704, 716-18, 101 P.3d 1218 (2004). In addition, the *Gunby* Court has required the giving of a limiting instruction informing the jury of the specific purpose for admission whenever K.S.A. 60-455 evidence comes in. *State v. Wilkerson*, 278 Kan. 147, 153, 91 P.3d 1181 (2004). These safeguards are designed to eliminate the danger that the evidence will be considered to prove a defendant's mere propensity to commit the charged crime.

The admission of the prior illegal drug usage had the effect of showing Quinton's criminal past and was inadmissible. This issue should have been raised at the time of trial by defense counsel. Failure to do so precluded appellate counsel from properly raising it on appeal, thus denying Quinton the right to have this issue heard on direct appeal. See *State v. Quinton*, 2007 WL 80599, *6 (unpublished opinion) ("Quinton's argument that the videotape should have been redacted is not properly before this court, as it was not raised below. As a result, Quinton's argument fails.").

10

*Officer McClarty's Remarks During the Interview Vouching for K.L.R.'s Credibility*

Officer McClarty made remarks during the interview vouching for K.L.R.'s credibility and her version of the alleged incident. The following are Officer McClarty's paraphrased statements:

- When she (K.L.R.) started having an exchange with you (Quinton), you ended up throwing her down, bouncing her head off the floor a couple times and dragging her by the hair into the bedroom. *Is there any reason why we be finding clumps of hair in the house? From where you drugged her?* (Emphasis added.) And that compiled with the marks on her head, it all kind of leads an officer . . . to see probable cause and reasonable suspicion that some of these acts did occur.
- Something is not totally jiving here.
- I got a probable cause to charge you . . . I'm not, [but] the other officers [have probable cause to charge you] because of the crime scene, your house, the things in your house that lead them to believe that and because of her (K.L.R.'s) statements.
- There is too much reasonable suspicion and probable cause laying at the scene that indicates her story. Okay, that her story matches what's at the scene.

These one-sided assertions, spoken as definitive conclusions by Officer McClarty to the jury, declared as fact that Quinton was guilty, that the evidence at the scene proved him guilty, and that there was no doubt about that evidence. Not only were these assertions by Officer McClarty improper vouching for the credibility of K.L.R., see *State v. Elnicki*, 279 Kan. 47, 53-54, 105 P.3d 1222 (2005), but these assertions impermissibly and prejudicially preempted the jury's fact-finding functions.

Moreover, McClarty's assertions also included descriptions of purported evidence that were invented by the officer for purposes of trying to obtain a confession. In the interview, McClarty tells Quinton that the officers found clumps of K.L.R.'s hair at the house. But under direct examination at trial, McClarty admitted that his fellow officers never found any clumps of hair in the house. In addition, McClarty told Quinton that there were other witnesses to this alleged incident. But McClarty had to admit this was also an untrue assertion. Thus, the jury again was permitted to consider for any purpose, these highly prejudicial and some clearly untrue assertions of Officer McClarty that had no basis in the record.

*Quinton's Criminal Record*

During his interview with Quinton, Officer McClarty brought up the fact that Quinton has a criminal record.

Evidence of the conviction of a witness for a crime not involving dishonesty or false statement shall be inadmissible for the purpose of impairing his or her credibility. If the witness is the accused in a criminal proceeding, no evidence of his or her conviction of a crime shall be admissible for the sole purpose of impairing his or her credibility unless the witness has first introduced evidence admissible solely for the purpose of supporting his or her credibility. See K.S.A. 60-421. The purpose of K.S.A. 60-421, when read together with K.S.A. 60-447 and K.S.A. 60-455 is to allow defendants to testify on their own behalf without having a history of past misconduct paraded before the jury.

We are at a loss to explain what relevance Quinton's past criminal record bore on the issues at trial other than to evidence his bad character. It is incomprehensible that defense counsel did not request redaction of the portion of the videotape that referenced Quinton's past criminal record on the ground that it was more prejudicial than probative.

12

*Officer McClarty's Remarks During the Interview that Quinton was Lying*

Of concern is the fact that Officer McClarty's remarks during the interview implied that Quinton was lying. The jury heard the following paraphrased statements of Officer McClarty in this category:

- The only thing I am getting from you that I didn't do nothing. I didn't do this. Well, I got not only her (K.L.R.) saying it, but I got physical evidence that you did this.
- You know there's too much here that is not jiving.
- All I got from you is that I didn't do it. I wouldn't force myself.
- The only thing I am getting from you is that I wouldn't do that. I wouldn't force that; I didn't do that. Well, I got to have more than that I didn't do that. That is why I have been trying to ask these specific questions. Those specific questions aren't being answered.
- I put all this together. There were very specific points that I was trying to give you an opportunity to tell me your side of the story. And you did not tell me your side of the story.

Here, the jury heard Officer McClarty repeatedly state his opinion about Quinton's unwillingness to tell his side of the story. The result of McClarty repeated opinion about Quinton's unwillingness to tell his side of the story likely left the jury with the impression that he was either lying or hiding the truth from the jury. Either impression would have been very devastating to his defense.

*Quinton's Nervousness Without an Attorney Present*

It was improper to allow the jury to hear that Quinton was nervous talking to Officer McClarty without an attorney present. Following consideration of cases from

other jurisdictions, our Supreme Court determined: "We conclude that it was improper for the prosecutor by questions and comments to draw incriminatory inferences from defendant's constitutional right under the Fourteenth Amendment to employ counsel as an element of the right to a fair trial. We further agree with the Maryland court that such evidence of 'obtention or attempted obtention of a lawyer or legal advice' is irrelevant and inadmissible." *State v. Dixon*, 279 Kan. 563, 591, 112 P.3d 883 (2005). "Comments that penalize a defendant for the exercise of his right to counsel and that also strike at the core of his defense cannot be considered harmless error. The right to counsel is so basic to all other rights that it must be accorded very careful treatment. Obvious and insidious attacks on the exercise of this constitutional right are antithetical to the concept of a fair trial and are reversible error." *United States v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980). Thus, defense counsel's failure to request a redaction of that evidence or his failure to object to its admission at trial was error that cannot be deemed harmless.

*Failure to Request a Limiting Instruction*

Defense counsel's failure to request a redaction of the videotape or object to it at trial falls below the standard set out in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and amounts to deficient performance by counsel. The defense in this case was that the sexual acts were consensual, so the alleged victim's credibility was of utmost importance to the prosecution's case. Failure to ask the court to exclude that evidence clearly prejudiced Quinton. Basically, the prosecution was allowed to introduce the testimony of Officer McClarty through the playing of the videotape that he believed Quinton was lying and that he believed that the alleged victim was telling the truth.

Defense counsel testified at the hearing on this motion that if he did not file a motion to redact, he should have. Indeed, our Supreme Court in *Elnicki*, 297 Kan. at 57, held that "[t]he absence of a limiting instruction merely compounded the already serious

14

problem, misleading the jury into believing that Hazim's [the officer] negative comments carried weight of testimony."

The inflammatory and prejudicial nature of McClarty's statements in the interview led to the conclusion that if the VHS videotape had not been admitted, that if the inadmissible statements had been edited out, or that if the jurors had been given a limiting instruction telling them how they were to consider McClarty's improper remarks about K.L.R.'s credibility, about the evidence, and about who he believed as between K.L.R. and Quinton, there is more than a reasonable probability that the outcome would have been different.

*Defense Counsel Failed to Effectively Assist Quinton in Plea Negotiations*

Quinton submitted a plea offer to the State which would have resulted in a 40- to 50-month sentence. This offer was rejected by the State which countered with an offer that would have resulted in a 20-year sentence. Defense counsel testified that Quinton was seriously considering the plea offer, but he talked Quinton out of accepting it because he believed the testimony of K.L.R. was particularly susceptible to cross-examination:

> "Q. [Movant's Counsel] Okay. When you say that you think one of the things you did
> wrong was telling him to take it to trial; your recollection is that Mr. Quinton was
> considering a plea at that point?
> "A. [Former Trial Counsel] Yeah, he was. He was leaning pretty hard towards taking that
> plea, and I thought that he would—I mean, he had two kids. He was raised without a dad,
> and he didn't want his children growing up without a dad. And I told him, well, the basis
> of the conversation was that I thought he should take it to trial. That he would regret
> everyday he was in prison if he didn't take it to trial. And that so many things can happen
> to you in prison that, you know, if you—we used to do a lot of cases out of [Hutchinson

15

Correctional Facility]. He could easily pick up more cases in prison, especially if people knew he was getting close to getting out.

"Q. Okay.

"A. I didn't force it to go to trial by any means, but I thought I could win.

"Q. Why did you think you would be successful at trial?

"A. Because I—well, I don't want to disparage the victim. I thought this was a very defendable case. Sometimes you're right and sometimes you're wrong.

"Q. And so it was your advice that you thought you could cross-examine the victim so that the consent defense would be successful?

"A. I thought we would be successful, yeah . . . . I don't think I was wrong. The jury, my recollection, was out 15 and a half hours before they convicted him.

"Q. So you would agree this was a really close case in the end?

"A. I thought. I think it was [a] very defensible case. I think he made the right decision. We just didn't get the results that we wanted."

Although Quinton testified at the motion hearing that he discussed the State's 20-year plea offer with his defense counsel and the risk of going to trial in a "he said-she said" case, he decided to reject the State's offer. Nevertheless, defense counsel was incorrect in his assessment regarding the likelihood of success at trial. He did not take into consideration damaging evidence against Quinton, such as Quinton's own inconsistent statements and the effect those statements would have on the jury. For example, Quinton, when questioned by Officer McClarty, initially stated that he did not have sex with K.L.R. but changed his statement to having consensual sex as the interview progressed.

In *Lafler v. Cooper*, 566 U.S. ___, 132 S. Ct. 1376, 1384, 182 L. Ed. 2d 398 (2012), the United States Supreme Court held that the Sixth Amendment right to counsel extends to the plea-bargain process. The *Lafler* Court further stated:

"If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. If that right is denied, prejudice can be shown

16

if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." 132 S. Ct. at 1387.

In *State v. Solomon*, 257 Kan. 212, 223, 891 P.2d 407 (1995), our Supreme Court held:

> "To set aside a guilty plea because ineffective assistance of counsel has rendered the plea involuntary, the defendant must show that counsel's performance fell below the standard of reasonableness and 'that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.' *Hill v. Lockhart*, 474 U.S. 52, 58-59, 88 L. Ed. 2d 203, 106 S. Ct. 366 (1985) (adapting the test from *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984])."

At trial, defense counsel realized how prejudicial and damaging Quinton's VHS videotape interview with officer McClarty was and how McClarty's statements would have a significant effect on the jury. Defense counsel tried to minimize the highly prejudicial statements in his closing argument:

> "Now, you—you—they're taking Mr. Quinton to task for statement he made at the time. Now, again, all of these interviews take place within about four hours of Mr. Quinton being arrested. He is arrested at 5:00 o'clock in the morning.
> . . . .
> "Now, the State also tried to introduced, or has introduced the statement he made to Detective McClarty. And what they tried to present is a situation where he was withholding—Mr. Quinton withholding information from—from Detective McClarty, and that he doesn't tell them right away that he had sex. Well, you have heard Mr. Quinton testify today. Well, they—he considered having sex the actual activity—the actual going through it; all the way through ejaculation. That hadn't taken place. And it's awfully coincidental they make that he was withholding information that—wasn't straight with them when Detective McClarty wasn't straight with him, either. And consider what condition Mr. Quinton was in. He had just been arrested about four hours earlier at his

17

house. Hadn't had any sleep. Hadn't had any food. Hadn't even got the one call everybody often sees in those TV shows.

. . . .

". . . He was concerned about [K.L.R.] He was concerned about his job. And, you know, he wasn't who—the police didn't tell him—Detective McClarty didn't tell him anything about investigating a possible sex crime, sodomy, rape, or kidnapping. And wouldn't it have been nice to know? I mean Dr. [sic] McClarty said he was going to use lies or deceit or trickery, make things up to try to trap Mr. — to try to trap Mr. Quinton. Mr. Quinton believed that he is being investigated for a possible domestic battery. He doesn't know what is going on. I mean he doesn't know where [K.L.R.] is or what kind of condition she is. This thing caught him totally off guard. Consider yourself, gentlemen. Which one of us in the same situation wouldn't have done the same thing? And again, I mean he has no reason—he has nothing to hide. He believes that he is being investigated for battery. And when Sergeant McClarty starts letting out a little bit more, starts being honest with him, he is honest with Detective McClarty."

Based on defense counsel's closing argument, defense counsel was clearly ineffective for failing to request the redaction of Officer McClarty's highly prejudicial and damaging statements, opinions, and assertions.

It is inconceivable to us that the defense counsel would encourage Quinton to reject the State's plea offer if defense counsel was not going to seek or request redaction of the highly prejudicial statements that ranged from inadmissible hearsay to inaccurate statements and opinion statements without any record of support. Not only was it error for the jury to hear these statements, but the errors carried with them a great probability of affecting the integrity of the jury's truth-finding process.

Had Quinton accepted the plea offer, he would have received a 20-year sentence (240 months). Nevertheless, following his conviction after the jury trial, he was sentenced by the court to 864 months' imprisonment. That is over three times the amount

he would have received under the State's plea offer. Under the circumstances, a sentence of 864 months amounts to a life sentence.

Defense counsel moved to exclude the videotape interview in its entirety; however, the trial court denied the motion. When the trial court denied the motion to exclude the entire videotape, defense counsel, at a minimum, should have moved to redact Officer McClarty's highly prejudicial and improper statements before encouraging Quinton to reject the State's plea offer. Thus, defense counsel denied Quinton effective assistance of counsel in encouraging Quinton to reject the State's plea offer before requesting, or even attempting, to redact Officer McClarty's highly prejudicial statements.

*Defense Counsel Was Ineffective in Eliciting Testimony Regarding Plea Negotiations*

During the trial, defense counsel elicited testimony from K.L.R.'s therapist, Rich Line, regarding plea negotiations. While cross-examining Line, defense counsel asked Line the following questions:

> "[Defense counsel]: Now, isn't it true that you also later on write in May that she (K.L.R.) hoped that the parties would just come to some agreement—this would all go away? May 3rd of 2004.
> "[Line]: I am getting there. Do you want me to read it?
> "[Defense counsel]: Well, what she says is there may be some offers open for a plea bargain; is that correct?
> "[Line]: Correct.
> "[Defense counsel]: "She receiving pressure from a family not to do a plea bargain?
> "[Line]: Correct."

Eliciting testimony regarding plea negotiations shows the jury that Quinton was considering accepting some responsibility for this alleged incident, which would be a

tacit admission of guilt on Quinton's part for this alleged incident. This admission is significant because Quinton's complete defense was based on consent.

Defense counsel later admitted at the motion hearing that it was improper to bring in testimony regarding Quinton's plea negotiations. By doing this, defense counsel undermined Quinton's claim that the events were consensual. Defense counsel was ineffective for allowing the jury to hear Quinton's desire for a plea bargain.

Of other concern is the fact that Quinton's defense attorney put before the jury K.L.R.'s statement that she is attracted to abusive males. While cross-examining K.L.R.'s therapist Line, defense counsel asked Line this question:

"[Defense attorney]: Have you look[ed] that over. Does it say in there the patient [K.L.R.] states her father could be a very critical person and she wonders if that's why she tends to pick out abusive males?
"[Line]: Yes."

Defense counsel's cross-examination of Line after this question dealt with K.L.R.'s hypersensitivity. As a result of this condition, Line concluded that K.L.R. tended to be hypersensitive in social actions. We are at a loss to explain what relevance K.L.R.'s attraction to abusive males has to do with K.L.R.'s hypersensitivity in social conditions. We can discern no reason why defense counsel would want the jury to hear K.L.R.'s prejudicial statement, through her therapist, that she tends to pick out abusive males for relationships.

*Defense Counsel's Errors Were Cumulative Thus Rising to the Level of Ineffective Assistance of Counsel*

In *Thompson v. State*, 293 Kan. 704, 270 P.3d 1089 (2011), our Supreme Court held that cumulative errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances

20

substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. *State v. Ellmaker*, 289 Kan. 1132, 1156, 221 P.3d 1105 (2009) (quoting *State v. Brown*, 285 Kan. 261, 305-06, 173 P.3d 612 [2007]).

The inflammatory and prejudicial nature of Officer McClarty's statements in the videotape of the police interview effectively instructed the jury that Quinton was guilty. Indeed, the jury was repeatedly told that Quinton was a cocaine addict; that K.L.R. was telling the truth about the alleged incident; that Quinton had a criminal record; that Quinton was being untruthful about the alleged incident; and that Quinton had something to hide because he was nervous talking to Officer McClarty without an attorney being present. We cannot ignore the fact that the prosecutor emphasized the importance of the videotape of the police interview to the jury in his closing argument. For example, at page 572 of the transcript of the prosecutor's closing argument, it indicates that the police interview was played for the jury. In addition, at pages 599-600 of the trial transcript, it states that an excerpt of the police interview was played for the jurors. Moreover, the prosecutor encouraged the jury to view the police interview during its deliberations.

Even defense counsel conceded that it was improper for him to have not moved to redact the highly prejudicial portions of the videotape of the police interview.

In a criminal trial, the emotional power of facts often plays a pivotal factor in the trial's outcome. Under our rules of evidence previously discussed, they restrict the entrance of certain evidence for the useful purpose of preventing unsound inferences from such evidence. Here, most importantly, the jurors were not given any type of limiting instruction for the purpose of telling them how they were to use or not to use this improper evidence contained in the videotape of the police interview during their deliberations.

21

The previously mentioned errors were augmented by the defense attorney's ineffective assistance in Quinton's plea negotiations. Finally, these errors were further augmented by defense counsel eliciting testimony that Quinton was interested in reaching a plea bargain with the State. By doing this, defense counsel undermined Quinton's claim that the events were consensual. This was clearly ineffective assistance of counsel. Thus, these errors substantially prejudiced Quinton and denied him a fair trial.

Because the earlier reasons are sufficient to require a new trial, it is unnecessary for us to address Quinton's remaining issues.

Reversed and remanded for a new trial.

\* \* \*

POWELL, J., dissenting: This is a difficult case to review without the distorting effects of hindsight. After the majority pounces on defense counsel's alleged deficiencies during the trial, I think it too easily reaches the conclusion that such deficiencies affected the outcome. The second element for a finding of ineffective assistance of counsel requires prejudice—meaning that Quinton bore the burden to show "'a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.'" *Edgar v. State*, 294 Kan. 828, 838, 283 P.3d 152 (2012). My review of the totality of the evidence in this case leads me to conclude that none of the alleged errors would have changed the outcome. In particular, Quinton's own statements in the video interview—even if redacted in part in accordance with the majority's wishes and coupled with a limiting instruction—were sufficiently damning to lead the jury to convict him. Quinton's statements to Officer McClarty were contradictory and likely lacked credibility in the eyes of the jury. Such evidence, coupled with the physical evidence which corroborated the victim's version of events, was sufficient to convict Quinton.

22

In addition, I particularly question the Monday morning quarterbacking of defense counsel's advice that Quinton reject the State's 20 years in prison plea offer. Our Supreme Court commands that "'[j]udicial scrutiny of counsel's performance [] be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.'" 294 Kan. at 838. It is easy to assign blame to defense counsel for urging Quinton to go to trial after he has been convicted and sentenced to a lengthy prison term of 864 months. But our duty is to go back in time to view events and decisions at the time they were made. It strikes me as pure 20-20 hindsight to question defense counsel's advice here given that this case boiled down to the credibility of the victim versus the credibility of the defendant. Defense counsel's judgment that the case was winnable was not an unreasonable position, particularly in light of the fact that Quinton had a constitutional right to make the State prove every element of its case to the jury beyond a reasonable doubt.

Moreover, *Lafler v. Cooper,* 500 U.S. ___, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012), upon which the majority relies, found counsel ineffective in the context of plea bargaining because counsel had given the defendant *incorrect legal advice*. However, that is not what happened here. Practically speaking, the majority scolds defense counsel for being wrong about the chances of success at trial, not for incorrect legal advice. I fear this will open the door to ineffective assistance claims anytime defense counsel recommends that a defendant go to trial but ultimately loses.

Finally, in my view, the majority wrongly bootstraps the alleged failures in the plea bargaining process with the alleged errors at trial into cumulative error. Such alleged errors, even if valid, do not strike me as errors that can be lumped together because the jury did not know of any alleged plea bargaining errors, and the essence of cumulative error is that the errors together denied the defendant the right to a fair *trial*.

Because I would affirm Quinton's convictions, I dissent.

23