IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,318

STATE OF KANSAS,
*Appellee*,

v.

ZSHAVON MALIK DOTSON,
*Appellant*.

SYLLABUS BY THE COURT

1.

Premeditation exists when the intent to kill arises before the act takes place and is accompanied by reflection, some form of cognitive review, deliberation, or conscious pondering. Premeditation requires more than mere impulse, aim, purpose, or objective. It requires a period, however brief, of thoughtful, conscious reflection and pondering—done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions.

2.

When the sufficiency of the circumstantial evidence supporting a jury's finding of premeditation is challenged on appeal, courts often reference five factors that are said to support an inference of premeditation: (1) the nature of the weapon used; (2) the lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. While these factors sometimes help appellate courts frame the sufficiency inquiry, they need not always apply them, nor are they limited to those factors. Whether premeditation exists is a question of fact. Thus, when an appellate court reviews the sufficiency of the evidence of

premeditation, the determinative question is not whether one or more of these factors are present. Instead, the court must decide whether a rational juror could have found beyond a reasonable doubt that the case-specific circumstances, viewed in a light most favorable to the State, established the temporal and cognitive components of premeditation.

Appeal from Wyandotte District Court; WESLEY K. GRIFFIN, judge. Oral argument held April 23, 2024. Opinion filed July 19, 2024. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant, and *Zshavon Dotson*, appellant, was on a supplemental brief pro se.

*Kayla L. Roehler*, deputy district attorney, argued the cause, and *Claire Kebodeaux*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Kris W. Kobach*, attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

WALL, J.:  A few days after Thanksgiving in 2018, Zshavon Malik Dotson shot and killed his friend Ronald "R.J." Marks Jr. at the Kansas City home that R.J. shared with his mother. Dotson and R.J. had grappled for control of R.J.'s rifle, and Dotson shot and killed R.J. in the kitchen after overpowering him. Dotson insisted at trial that he had acted in self-defense. R.J.'s mother cast Dotson as the aggressor. A jury weighed the conflicting evidence, assessed the credibility of Dotson and the mother, and found Dotson guilty of first-degree premeditated murder and aggravated battery. We now consider Dotson's appeal.

Dotson and his appellate attorney both filed briefs in this appeal, and there are many issues before us. They argue the State presented insufficient evidence of premeditation, the prosecutors repeatedly misstated the applicable law during closing arguments, the district court made several errors when instructing the jury, Dotson's trial

2

counsel provided constitutionally ineffective assistance, and our court's caselaw has made first-degree premeditated murder and second-degree intentional murder into identical offenses. We have carefully considered these challenges, but we disagree with Dotson that there was any error that warrants a reversal. We therefore affirm his convictions.

FACTS AND PROCEDURAL BACKGROUND

A few facts are undisputed. Dotson and R.J. wrestled over R.J.'s rifle. Dotson overpowered R.J. Dotson shot R.J. And R.J.'s mother, Carolyn Marks, witnessed most of the confrontation. But what precipitated the fight, who the aggressor was, how it ended, and what happened after—those facts were sharply contested at trial. As the State told it, Dotson had argued with R.J. because Dotson had no place to live, and Carolyn would not let him stay at her house. Dotson escalated that argument by diving for R.J.'s rifle, and once he wrenched control of the weapon, he shot and killed R.J. in cold blood. As the defense told it, R.J. and Carolyn were behind on their bills and demanded money from Dotson at gunpoint. Dotson grabbed the gun to defend himself, and he shot R.J. with the rifle only after R.J. pulled a handgun on him. The State's account relied almost entirely on Carolyn's testimony; the defense's account relied almost entirely on Dotson's testimony.

According to Carolyn, she came out of her bedroom when she heard people talking in the living room and found her son and Dotson sitting on opposite sides of a sectional. Dotson had stayed the previous night because his girlfriend had kicked him out, but Carolyn said he could not live there and needed to have someone pick him up. Dotson told her he had no place to go. Carolyn went back to bed to lie down. She came out of her bedroom for a second time when she heard arguing. Dotson and R.J. were still sitting on the couch. Carolyn told them to cut it out and went back to her bedroom.

3

When Carolyn heard arguing again, she came out of her bedroom for a third time. She could hear the argument—Dotson was saying that R.J. was never there for him and that he had nobody; her son was saying that Dotson was never there for him either but that his mom and he were always helping Dotson. When Carolyn came into the living room, Dotson and R.J. were standing with eyes locked about 6 feet apart. When R.J. turned to look at her, Dotson dove straight for the rifle that had been on the floor next to her son. R.J. dove on Dotson and grabbed the gun. The fight was on.

While Dotson and R.J. were grappling, Carolyn headed back to her bedroom and grabbed a revolver from under her bed. She came back into the living room, yelled for the boys to stop, and then shot her revolver in the air as a warning. But the boys did not stop. The shot startled R.J., and Dotson slammed him against the wall. Then with her son still gripping the gun, Dotson swung it back and hit Carolyn in the face with the stock. Carolyn fell unconscious.

When she awoke on the ground, the boys were in the kitchen, still wrestling over the gun. Dotson backed R.J. up against the dryer, hit him with the stock, and knocked him to the ground. As R.J. was falling, he reached his hands out and started to say "no." Dotson shot him twice in "one quick motion." After those shots, her son was "laying with his hands up, eyes looking straight up at the ceiling, not blinking or nothing." Dotson stood over R.J., gun pointed at him, ignoring Carolyn's pleas. Then after a minute or two, Dotson shot her son several more times. Unlike the "first shots" that had been in the "upper chest area," the second round of shots were "below [the] waist" in the groin. After that, Dotson "took off running and ransacking [the] house" and then fled. Carolyn called the police.

Dotson offered a very different account. According to him, R.J. was agitated because he had been on the phone arguing with somebody about money for the electric bill. R.J. was upset with Dotson because Dotson had not been there to bond him out of

4

jail or to pay the electric bill. Dotson responded that he had bonded R.J. out once and it was not Dotson's responsibility to keep paying for his mistakes or to pay for their electric bill when he had asked to stay only a few nights. Carolyn told Dotson that if he could not help to pay the bill, he had to leave, and Dotson agreed to do so. R.J. then grabbed his rifle, pointed it at Dotson, and demanded money. Then Carolyn grabbed her gun and pointed it at Dotson too.

Dotson grabbed the barrel of the rifle, pushed R.J. against the wall, and began wrestling over the gun. After 15-30 seconds, Dotson was able to overpower R.J., secure the gun, and send him flying to the ground. Before Dotson could diffuse the situation, R.J. pulled a handgun from his hip to shoot Dotson. Dotson was forced to fire, and he shot consecutive times without pause. After that, he picked up the rifle and the handgun, ran to the bedroom to get his bag, and ran out the front door.

After the State and the defense had presented their evidence, the district court instructed the jury on the charges. A district court must instruct the jury on lesser-included offenses when there is some evidence, viewed in a light most favorable to the defendant, that would reasonably justify the defendant's conviction for a lesser crime. See *State v. Berkstresser*, 316 Kan. 597, 601, 520 P.3d 718 (2022). So here, the court instructed the jury that it could find Dotson not guilty or find him guilty of either first-degree murder, second-degree murder, voluntary manslaughter, or involuntary manslaughter, and it described the elements of each offense. The court also explained that it was up to the jury to assess the significance and the credibility of each witness' testimony. Evidently, the jury determined that Carolyn's testimony was credible, for it found Dotson guilty of first-degree murder. The jury also convicted Dotson of aggravated battery for striking Carolyn during the fight, but Dotson's appeal primarily focuses on his murder conviction.

5

The district court imposed a life sentence with no chance of parole for 25 years—a so-called "hard 25" sentence. Dotson appealed directly to our court, and we have jurisdiction because the district court imposed a life sentence and because Dotson was convicted of an "off-grid" crime, meaning his sentence was not imposed under the grids that set out the presumptive sentences for most felonies. See K.S.A. 22-3601(b)(3)-(4). We heard arguments during a special session at Lansing Middle School on April 23, 2024.

ANALYSIS

Dotson's principal challenges to his murder conviction focus on the concepts of premeditation and self-defense. He argues the State presented insufficient evidence to establish premeditation. And he contends the prosecutors mischaracterized the law on self-defense and premeditation during closing arguments, which lowered the State's burden to secure a conviction and denied him a fair trial. We address these challenges first, concluding that there was legally sufficient evidence of premeditation under the deferential standard that appellate courts use and that the prosecutors' minor misstatement about premeditation was harmless beyond a reasonable doubt given the trial evidence.

Then we address Dotson's other challenges. Dotson argues his trial counsel provided constitutionally ineffective assistance, but he either fails to show error or cannot show that there is a reasonable probability the verdicts would have been different without the deficient performance he alleges. Dotson also argues the district court erred in four ways when instructing the jury, but these challenges are either foreclosed by our recent caselaw or so lacking in detail that we cannot meaningfully review them. Next, Dotson argues that our court's caselaw has made first-degree premeditated murder and second-degree intentional murder into identical offenses, thus he can be guilty of only the lesser offense under the so-called "identical offense doctrine." But we have recently considered

6

and rejected this argument, too. Finally, we reject Dotson's argument that cumulative error deprived him of a fair trial because only one trial error occurred, so the doctrine does not apply.

I. *The State Presented Sufficient Evidence of Premeditation*

Dotson was convicted under K.S.A. 2018 Supp. 21-5402(a) of first-degree murder for killing R.J. "intentionally" and with "premeditation." But he argues the State presented insufficient evidence of premeditation. In his view, the State's evidence showed only that he killed R.J. "intentionally," so he should be resentenced for the lesser-included crime of second-degree murder. See K.S.A. 2018 Supp. 21-5403(a) (defining second-degree murder as a "killing . . . committed . . . intentionally"); *State v. Kingsley*, 252 Kan. 761, 782, 851 P.2d 370 (1993) ("[When] a defendant has been convicted of the greater offense but evidence supports only a lesser included offense, the case must be remanded to resentence the defendant for conviction of the lesser included offense.").

Our approach to sufficiency challenges is well settled. When the State charges a defendant with a crime and the defendant exercises his or her right to a jury trial, it is the jury, not an appellate court, that is tasked with weighing the evidence, judging the credibility of witnesses, and determining questions of fact. See *State v. Hillard*, 315 Kan. 732, 784, 511 P.3d 883 (2022). So when the jury convicts the defendant after hearing the State's evidence, and the defendant challenges the sufficiency of that evidence on appeal, an appellate court must defer to the jury's factual findings. Appellate courts do that by reviewing the evidence in a light most favorable to the State. 315 Kan. at 784. Using this standard, the appellate court must affirm the conviction if a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. 315 Kan. at 784. The question for us, then, is whether a rational fact-finder could have concluded that Dotson acted with premeditation.

Our court thoroughly examined premeditation in *State v. Stanley*, 312 Kan. 557, 478 P.3d 324 (2020). Premeditation "exists when the [intent to kill] arises before the act takes place and is accompanied by reflection, some form of cognitive review (i.e., 'thinking over'), deliberation, conscious pondering." 312 Kan. at 572. In other words, "[p]remeditation requires more than mere impulse, aim, purpose, or objective"—"[i]t requires a period, however brief, of thoughtful, conscious reflection and pondering— done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions." 312 Kan. at 574. Thus, premeditation consists of two components: a temporal component (the intent must arise before the act) and a cognitive component (deliberation). See *State v. Coleman*, 318 Kan. 296, Syl. ¶ 1, 543 P.3d 61 (2024).

Occasionally, the State may offer direct evidence of premeditation—for example, a coconspirator might testify to planning the victim's death with the defendant. But more often, the State tries to prove premeditation with circumstantial evidence. See *State v. Scaife*, 286 Kan. 614, 620, 186 P.3d 755 (2008). In those cases, the jury may infer premeditation from the case-specific circumstances, provided the inference is reasonable. *Hillard*, 315 Kan. at 787.

When the sufficiency of that circumstantial evidence is challenged on appeal, our court often references five factors that are said to support an inference of premeditation. See, e.g., *State v. Hilyard*, 316 Kan. 326, 331, 515 P.3d 267 (2022) (reciting five premeditation factors). Those factors include (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. 316 Kan. at 331.

8

While these factors sometimes help our court frame the sufficiency inquiry, we need not always apply them, nor are we limited to those factors. See *State v. Holmes*, 272 Kan. 491, 499, 33 P.3d 856 (2001) ("[I]n a prosecution for premeditated murder, the law does not presume the existence of premeditation or deliberation from any state of circumstances."). In other words, appellate courts should not apply the five factors in an overly formalistic manner. Whether premeditation exists is a question of fact. *Stanley*, 312 Kan. 557, Syl. ¶ 5. Thus, when reviewing the sufficiency of the evidence of premeditation, the determinative question is not whether one or more of these factors are present. Instead, we decide whether a rational juror could have found beyond a reasonable doubt that the case-specific circumstances, viewed in a light most favorable to the State, established the temporal and cognitive components of premeditation.

Like most other premeditated first-degree murder cases, there was no direct evidence of premeditation here. But when the circumstantial evidence is viewed with the required deference to the State, which requires us to adopt Carolyn's version of the incident over Dotson's when their accounts differ, we conclude it was sufficient to establish premeditation. The evidence shows that Dotson found himself in a desperate situation:  he had been kicked out of his girlfriend's home and had no place to live. His only remaining option was Carolyn and R.J.'s house. When Carolyn foreclosed that option, Dotson's demeanor noticeably changed, and he accused R.J. of never supporting him. When Carolyn emerged from her bedroom for the third time and told Dotson and R.J. to stop arguing, Dotson seized on the momentary distraction to lunge for the lethal rifle. Then during the protracted struggle, Dotson was undeterred by Carolyn's pleas to stop and the warning shot she fired in the air. And finally, Dotson fired at close range into R.J.'s chest and killed him as soon as he gained full control of the rifle.

The State also suggests that the one- to two-minute pause between the shots Dotson fired into R.J.'s chest and the shots he fired into R.J.'s groin are persuasive evidence of premeditation. In the State's view, that pause provided Dotson a chance for

9

thoughtful consideration before he overrode any cognitive brake and fired more shots. Dotson, on the other hand, insists that the record shows the first two shots to R.J.'s chest were fatal. So he argues that the pause and additional shots cannot factor into our premeditation analysis because they came "after the homicidal act." But we need not resolve that dispute because there is sufficient evidence supporting the jury's finding of premeditation even if we consider only those circumstances preceding the initial shots.

The jurors reasonably could have inferred from Dotson's decision to lunge for the lethal weapon when R.J. was distracted and from Dotson's decision to carry on the fight despite Carolyn's pleas and warning shot that Dotson had formed the intent to kill R.J. before firing the fatal shots. And from the same evidence, the jury reasonably could have inferred that Dotson engaged in a period of reflection, sufficient to change his mind and abandon that intent, before killing R.J. In short, there was sufficient circumstantial evidence for the jury to find beyond a reasonable doubt that the State had proved both the temporal and the cognitive components of premeditation. See *State v. Holmes*, 278 Kan. 603, 633-34, 102 P.3d 406 (2004) (sufficient evidence of premeditation when defendant was initial aggressor, wrestled for control of gun, overpowered victim, shot victim after wresting control of the weapon, and did not seek medical attention).

We understand that Dotson may view the facts of his case very differently. But as an appellate court, we must defer to the jurors, who weighed the conflicting evidence, judged the credibility of witnesses, and determined questions of fact. And because the jurors convicted Dotson, we must accept Carolyn's version of the incident over Dotson's version where their accounts differ. Under that standard, we conclude that sufficient evidence supports Dotson's first-degree murder conviction.

10

II. *The Prosecutors Did Not Misstate the Law of Self-Defense, and Their Misstatements About the Law of Premeditation Were Harmless*

Dotson's other principal challenge is based on the prosecutors' statements during closing arguments. After a district court instructs the jury on the applicable law, the State and defense may offer closing arguments. K.S.A. 22-3414(4) (setting out the order of trial). The State goes first, followed by the defendant. And the State may then offer a rebuttal. K.S.A. 22-3414(4). At Dotson's trial, two prosecutors divvied up that task: one prosecutor delivered the initial closing argument, and the other delivered the rebuttal. Dotson argues that these prosecutors violated his federal constitutional right to a fair trial by misstating the law on self-defense and premeditation. See *State v. Sherman*, 305 Kan. 88, 108-09, 378 P.3d 1060 (2016) (prosecutor's misstatement of law in state criminal prosecution that prejudices defendant violates defendant's due-process right to fair trial under Fourteenth Amendment to United States Constitution). Dotson's trial counsel did not object to these alleged errors at trial, but we review claims of prosecutorial error even without a timely objection. *State v. Guebara*, 318 Kan. 458, 480, 544 P.3d 794 (2024).

Our standard of review is well-established. We first decide whether the prosecutor's statement fell "'outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction.'" *State v. Anderson*, 318 Kan. 425, 437, 543 P.3d 1120 (2024). That is often a case-specific inquiry because "'the line between permissible and impermissible argument is [often] context dependent.'" 318 Kan. at 439. If the defendant shows error, then we decide whether the error is prejudicial under the constitutional harmless-error standard. Under that standard, we will reverse the defendant's conviction unless the State can show that it was harmless beyond a reasonable doubt, meaning that "'there is no reasonable possibility that the error contributed to the verdict.'" *Guebara*, 318 Kan. at 480.

11

A.  *The Prosecutors Did Not Misstate the Controlling Law on Self-Defense*

Under Kansas law, "[a] person is justified in the use of deadly force" when he or she "reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person." K.S.A. 21-5222(b). The person using deadly force under those circumstances has no duty to retreat. See K.S.A. 21-5222(c). But if the person is the one who "initially provokes the use of any force" against themselves or another—that is, if the person is the initial aggressor—then the use of deadly force is not justified unless one of two safe-harbor provisions applies. K.S.A. 21-5226(c). Under the safe-harbor provision relevant here, an initial aggressor is justified in the use of deadly force if he or she "has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force." K.S.A. 21-5226(c).

Dotson argues the prosecutors misstated this controlling law by asserting that an initial aggressor can never claim self-defense. He draws our attention to two statements that one prosecutor made during the initial closing argument. She said "[y]ou cannot claim self-defense in a fight that you started" and that the "State argues that you do not get to say self-defense when you initially provoke an argument." Dotson then points us to rebuttal, when the other prosecutor said "[y]ou don't get to shoot somebody because you started a fight and they pull a knife and you're, like, oh crap, they're gonna kill me with a knife. That's not how that works." The State contends Dotson is taking the prosecutors' comments out of context.

We agree with the State. During the initial closing argument, the first prosecutor correctly stated the law and then asserted that Dotson could not claim self-defense as the initial aggressor because the evidence showed he had not used every reasonable means of escape:

12

"The defendant is claiming he's not guilty because of self-defense. If you think that pumping round after round after round into a man who's laying on the floor is reasonable and lawful, first I would ask you to consider the initial aggressor instruction. That's Instruction Number 16. It talks about how a person who initially provokes the use of force against himself is not permitted to use force to defend himself unless that person reasonably believes he's in present danger of death or great bodily harm and has used every reasonable means to escape such danger. He was standing next to the back door. He did not use every reasonable means of escape as he stood there over R.J.

"You cannot claim self-defense in a fight that you started. The State's evidence shows you that the defendant started this fight when he dove, lunged, slid, whatever word you want to use, for that gun. State argues that you do not get to say self-defense when you initially provoke an argument. Even if you're unsure about how it began, I submit to you that you can know how it ended, with [Dotson] standing over R.J. with an assault rifle."

And during rebuttal, the other prosecutor correctly stated the law on initial-aggressor self-defense and then argued Dotson could not successfully invoke self-defense because he had not tried to escape:

"And you know what you don't get to do under Kansas law if you are the person that dives for that gun? You do not get to claim self-defense later, not unless you have exhausted every means necessary to remove yourself from that situation. You go start a fist fight with somebody and they pull a knife, you gotta run away. You don't get to shoot somebody because you started a fight and they pull a knife and you're, like, oh crap, they're gonna kill me with a knife. That's not how that works.

"And, ladies and gentlemen, I submit to you the evidence is cleanly consistent that [Dotson] went for that gun first. Even if you didn't buy it, did he exhaust means of escape? As you will read in those instructions, he stood by the back door as he stood over R.J. in State's 78. I want you to remember this. That's the back door. That's freedom. That's safety. That is escape."

13

This context makes clear that the prosecutors properly stated the law and then argued the relevant safe-harbor provision did not apply given the trial evidence. Such comments are well within the wide latitude afforded prosecutors, so Dotson has failed to establish his first claim of prosecutorial error.

B. *The Prosecutors Erred by Diminishing the Temporal Element of Premeditation During Closing Argument, but that Error Was Harmless*

As we discussed above and at length in *Stanley*, premeditation has both a temporal and a cognitive element:  a killing is premeditated when the intent "arises before the act takes place" and is "accompanied by reflection, some form of cognitive review (i.e., 'thinking over')." *Stanley*, 312 Kan. at 572. In his appellate briefing, Dotson argued the prosecutors had diminished the importance of the temporal element of premeditation during closing arguments by asserting that premeditation meant "just more than instantaneous." He then filed a letter under Supreme Court Rule 6.09, which allows a party to advise an appellate court of "persuasive or controlling authority that has come to the party's attention" after briefs were filed. See Supreme Court Rule 6.09(a)(1) (2024 Kan. S. Ct. R. at 40). That letter cited our recent decision in *Coleman*, which held that a prosecutor had erred "during closing arguments by making statements that contradict or obfuscate the cognitive aspect of premeditation by saying premeditation only requires time." *Coleman*, 318 Kan. 296, Syl. ¶ 1. But when pressed at oral argument, Dotson's appellate attorney repeatedly stated he had cited *Coleman* only as support for his argument on the temporal component of premeditation. Though the record shows little, if any, discussion of the cognitive component during closing argument, Dotson's attorney expressly disclaimed any challenge to the prosecutors' statements (or lack thereof) on that component of premeditation. The question before us, then, is whether the prosecutors misstated the law by minimizing the importance of the temporal component of premeditation.

14

To satisfy the temporal component of premeditation, the State must show that the intent to take another's life and the opportunity for cognitive reflection arose "'before the final act of killing,'" though "'there is no specific time period'" required. 318 Kan. at 301. As a result, our court has repeatedly cautioned prosecutors against making arguments that "essentially suggest[]" that premeditation could form instantaneously. See *State v. Hall*, 292 Kan. 841, 852, 257 P.3d 272 (2011). For example, our court has found error when a prosecutor argued that a defendant could have "'form[ed] premeditation after the pull of the first trigger, because remember, he pulls four times.'" 292 Kan. at 850. We also found error when a prosecutor argued that premeditation could have formed "just a half second before" the fatal shot. *State v. Kettler*, 299 Kan. 448, 474-76, 325 P.3d 1075 (2014). And when a prosecutor argued that premeditation "'can occur in an instant'" and "'can happen in a second.'" *Holmes*, 272 Kan. at 497-500. Such arguments can blur the line between a premeditated killing and an instantaneous, intentional killing. See *State v. Moncla*, 262 Kan. 58, 70-73, 936 P.2d 727 (1997) (adding phrase "it may arise in an instant" to pattern instruction on premeditation tended to diminish importance of the element of premeditation).

Dotson argues the prosecutors made the same error here. When discussing premeditation during the initial closing argument, one prosecutor said the State needed to show the killing was "more than just an instant act of taking [R.J.'s] life," not that Dotson had planned to kill R.J. far in advance:

> "Premeditation. In the instruction, it says it is more than an instantaneous, intentional act of taking another's life. I wish I could define for you what that instantaneous, what that amount of time is. I can't define that for you. That's up to you, but I can tell you that the State doesn't have to prove—I don't have to show you [Dotson]'s diary from the day before saying and I am going to kill R.J. I don't have to show that to you. I do have to show you that it's more than just an instant act of taking [R.J.'s] life, and I believe the State has shown that to you."

15

Then during rebuttal, the other prosecutor recounted Carolyn's testimony that Dotson had lunged for the gun when R.J. had turned to look at Carolyn. The prosecutor said that to establish premeditation, the State needed to show "[i]t's just more than instantaneous":

> "She comes out fussin'. She said R.J. turned and looked at his mom. That was the opportunity, that was it. These men are locked eye to eye. She said they're standing there. I want you to picture an umpire and a baseball manager, right? But if we're locked and I turn and I look, that's what you need. That's it. The opportunity came and he took it, and that's why when [the co-prosecutor] was talking to you about premeditation. It sounds like a big deal from TV and movies. Like she said, we don't have to find someone's diary that talks about their plan. It's just more than instantaneous."

We agree with Dotson. Like assertions that premeditation can be formed "just a half second before" the fatal shot or "can happen in a second," the prosecutors' argument that premeditation is anything "more than instantaneous" improperly equated the temporal component to a near-instantaneous act. And by suggesting premeditation "sounds like a big deal from TV and movies" but only requires conduct that is "just more than instantaneous," the prosecutors' argument further diminished the temporal component. We do not mean to suggest the prosecutors' comments were flagrant or intentional. But given the caselaw described above, the comments cross just beyond the wide latitude afforded prosecutors and into the domain of improper argument.

Even so, the State has convinced us the error was harmless beyond a reasonable doubt. Dotson challenged the prosecutors' comments about the temporal component of premeditation only, not their statements (or lack thereof) about the cognitive component. And there was ample evidence to support the temporal component: Dotson's demeanor markedly changed when Carolyn told him that he could not stay at her house; Dotson argued with R.J. that R.J. was never there for him; when Carolyn interrupted that

16

argument, Dotson seized on R.J.'s momentary distraction to dive for the gun; there was a protracted struggle; and Dotson was undeterred by Carolyn's pleas to stop, her warning shot, or her being knocked unconscious. We believe this circumstantial evidence overwhelmingly supports the jury's finding that Dotson's intent to kill R.J. arose before the lethal act and that there was an opportunity for a period of thoughtful deliberation.

Also, we "often weigh [jury] instructions when considering whether any prosecutorial error is harmless," and we "presume the jurors follow the instructions." *State v. Brown*, 316 Kan. 154, 170, 513 P.3d 1207 (2022). Here, the district court gave the standard pattern jury instruction on premeditation, which correctly states that "[a]lthough there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." See PIK Crim. 4th 54.150 (2020 Supp.). The volume of evidence supporting the temporal component of premeditation coupled with the accurate jury instruction lead us to conclude that there is no reasonable probability the prosecutors' misstatements contributed to Dotson's conviction.

Before moving on, we briefly address one last prosecutorial-error argument Dotson makes. In a supplemental brief prepared and filed in our court without the help of an attorney, Dotson suggests that one prosecutor erred by mischaracterizing the evidence during the trial's opening argument. As Dotson frames it, the prosecutor told the jury that Dotson did not stop shooting R.J. until the magazine ran out of bullets. Dotson argues that the trial evidence did not support that assertion. See *Coleman*, 318 Kan. 296, Syl. ¶ 2 ("Prosecutors err by arguing facts not in evidence."). But the prosecutor argued that Dotson stopped firing only because he decided he was finished and specifically not because he ran out of bullets: "[H]e fired and kept firing 'til he decided he was done. It wasn't 'til the magazine ran out of bullets. It wasn't until someone got out of sight or he got out of range, it wasn't until he had decided he was done." Dotson's pro se argument lacks merit, and we turn to the remaining issues on appeal.

17

III. *Dotson Has Not Established that He Received Constitutionally Ineffective Assistance of Trial Counsel*

After he was convicted, Dotson filed a pro se motion for a new trial based on the allegedly ineffective assistance of his trial counsel, Brett Richman. The district court appointed a new attorney, who filed a new-trial motion that incorporated and supplemented the claims Dotson had raised himself. The district court held an evidentiary hearing on that motion, and Dotson and Richman both testified. The court denied Dotson's motion in an extended ruling from the bench.

Dotson renews three of the ineffective-assistance claims he raised below. He argues that Richman failed to adequately communicate with him, that Richman failed to secure the testimony of an important witness, and that Richman failed to call two officers who would have undermined the testimony of the victim's mother. We analyze those claims under the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which our court adopted in *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985). Under the first prong, Dotson must establish deficient performance by showing that Richman's representation fell below an objective standard of reasonableness. *Khalil-Alsalaami v. State*, 313 Kan. 472, 485-86, 486 P.3d 1216 (2021). As we have often noted, "[j]udicial scrutiny of counsel's performance must be highly deferential." 313 Kan. 472, Syl. ¶ 4. Under the second prong, Dotson must establish prejudice by showing "with reasonable probability that the deficient performance affected the outcome of the proceedings, based on the totality of the evidence." 313 Kan. at 486. As we explain below, Dotson has failed to establish any prejudicial error.

A.  *Dotson Has Not Shown that Richman Provided Ineffective Assistance by Failing to Communicate with Dotson*

Dotson's failure-to-communicate challenge has three parts. First, Dotson alleges that he could not make an informed decision about accepting a plea bargain because Richman did not inform him of the potential penalties he faced. Dotson testified to that at the evidentiary hearing. But the district court did not find Dotson's testimony credible. Instead, it found that Dotson had rejected the State's plea offers despite fully understanding the penalties he faced and the uncertain outcome at trial. We review that finding for substantial competent evidence, meaning we do not consider other evidence that might support a different result, provided sufficient evidence supports the district court's finding. See *Guebara*, 318 Kan. at 476. And here, substantial competent evidence supports the district court's finding. Richman testified that he informed Dotson that he faced "a Hard 25 or 50 depending on mitigating circumstances." He also testified that the potential penalties were discussed during an unsuccessful plea mediation. And it was the district "court's opinion, from sitting on every single hearing where we discuss[ed] pleas," that "Mr. Dotson was emphatic that he would not take a plea anywhere close to what was offered by the State." The court added that it had "made it very clear that any decision about a plea offer is 100 percent that of the defendant."

Second, Dotson argues that Richman's overconfidence in the trial outcome improperly influenced his decision to reject a plea and go to trial. Dotson testified at the evidentiary hearing that Richman had told him "we had a good chance of winning," and "[t]here was no way they'd find me guilty of premeditated murder." And Richman testified that he continued to believe a first-degree-murder conviction was unwarranted. The district court ruled that Richman's statements were not unfounded. Though the evidence of premeditation was legally sufficient, it could have also supported convictions for the lesser charges in the case. And the State's evidence for premeditation rested

19

almost entirely on Carolyn's testimony, meaning the jury reasonably could have reached a different result if it had assessed her credibility differently. Moreover, as Dotson acknowledged during his testimony, Richman never guaranteed acquittal or conviction on a lesser charge. As a result, we affirm the district court's conclusion that Richman's performance was not deficient.

And third, Dotson takes issue in his pro se brief with the amount of pretrial communication he had with Richman. Dotson asserts that Richman visited him just 14 times in the 2 and a half years before trial and that each meeting was less than 30 minutes. But Dotson offers no evidence suggesting that 14 visits was unreasonable given the circumstances of his case. Nor does Dotson acknowledge that the COVID-19 pandemic delayed his trial by nearly a year and a half during the time period in question. Thus, Dotson has not established that Richman's pre-trial communications were deficient.

B.  *Dotson Has Not Established that Richman's Failure to Interview the Victim's Girlfriend Was Prejudicial*

In his second ineffective-assistance claim, Dotson argues Richman should have done more to secure the testimony of R.J.'s girlfriend, Jasmine Harris, who had been on the phone with R.J. and overheard part of the argument between Dotson and R.J. Harris apparently told police she heard the gun cocking. In Dotson's view, she would have been "an important witness" because her testimony "would have bolstered [Dotson]'s testimony that [R.J.] was the aggressor" because it suggested that R.J. had the gun during the argument. Dotson claims "[i]t was vital that Richman track down Harris and determine what she knew" and that, "[w]ithout knowing what she would say, Richman failed to fully investigate the case and could not present a full defense."

At the evidentiary hearing, Richman testified that, as a matter of strategy, he did not want the "significant other of the deceased" to testify. He also believed Harris' statement to police bolstered the State's case because it suggested Dotson was the aggressor and R.J. had remained calm. But Richman conceded he did nothing to locate Harris besides leaving voicemails. Richman did not know whether Harris' testimony would be consistent with her statement to police because he never spoke to her. The district court found that Richman could have done more to locate Harris but that Dotson could not show "undue prejudice" because Richman had made a strategic decision.

The district court reached the right result for the wrong reason. "Strategic choices that counsel made after thoroughly investigating the law and facts relevant to plausible options are virtually unchallengeable." *State v. Hutto*, 313 Kan. 741, 750, 490 P.3d 43 (2021). But because Richman failed to do the relevant investigation, his decision not to call Harris is not entitled to deference as a "strategic decision," as the district court reasoned. That said, even though Dotson's new attorney subpoenaed Harris for the evidentiary hearing, she did not appear. Nothing in the record shows what she would have testified to at trial. Thus, Dotson cannot establish that "there is a reasonable probability that . . . the outcome of the trial would have been different" had Richman secured Harris' testimony. *State v. Evans*, 315 Kan. 211, 218, 506 P.3d 260 (2022).

C. *Dotson Has Not Established that Richman's Failure to Examine the Officers Who Took the Victim's Mother's Statement Was Prejudicial*

Finally, Dotson contends that Richman needed to call the officers who took Carolyn's initial statement as witnesses. Richman testified that because Carolyn had been an uncooperative witness at the preliminary hearing, he planned to aggressively question her on inconsistent statements and "paint her as someone who is simply trying to protect her son." But he said that Carolyn's demeanor substantially changed at trial: "she would answer questions, she would not do anything that was untowardly difficult and I believe

she cried at least once, maybe twice." As a result, Richman changed tactics to avoid attacking a sympathetic witness. Dotson argues that, for this very reason, Richman needed to call the officers who took her statement, otherwise, he "could not point to the officers to establish the inconsistencies in Carolyn's testimony at trial versus her statements to the police."

The district court found that Richman "pointed out numerous inconsistencies with the testimony of [Carolyn] from statements made to reporting officers, to detectives, to preliminary hearing to those statements made during the trial" and "did a good job of pinpointing the varying statements that she gave, and that was, as he indicated here today, very important to their argument of self defense and who was the initial aggressor." The court concluded that Richman's "inactions" did not "reach the level of *Strickland* prejudice."

While the court was correct that Richman cross-examined Carolyn on her inconsistent statements, Carolyn's answers were vague (e.g., "I don't remember," "I remember talking to several people, but that's all," "That's a good question."), which is exactly why Dotson contends the officers were needed. Even so, Dotson fails to explain in his briefing what specific inconsistent statements Carolyn made within her statements to police, her preliminary-hearing testimony, and her trial testimony. So, as above, Dotson cannot establish that "there is a reasonable probability that . . . the outcome of the trial would have been different" had Richman called these officers as witnesses. *Evans*, 315 Kan. at 218.

IV. *The Jury Instructions Were Not Erroneous*

Dotson raises four challenges to the jury instructions. He raised two of those in the brief his appellate attorney filed. Dotson contends that the district court should have supplemented its instruction on premeditation even though Dotson did not ask it to. He

22

also argues that it was improper for the jury's verdict form—which we treat as a jury instruction—to list "guilty" above "not guilty." See *State v. Fraire*, 312 Kan. 786, 795-96, 481 P.3d 129 (2021) (challenges to a verdict form fall under the instructional-error framework). The other two challenges were raised in Dotson's pro se supplemental brief. There, Dotson argued the district court failed to instruct the jury on imperfect self-defense and failed to include language addressing a heat-of-passion killing in its voluntary-manslaughter instruction. But none of these arguments demonstrate instructional error.

A. *The District Court Did Not Err when It Failed to Provide an Unrequested Supplemental Instruction on Premeditation*

The district court gave the standard pattern instruction on premeditation. See PIK Crim. 4th 54.150 (2020 Supp.). Dotson proposed no modifications to the instruction. But he now argues the district court erred by failing to supplement the instruction with language developed in *Stanley*. There, our court said it was best practice to provide additional clarifying language when a district court uses a *Bernhardt* instruction. *Stanley*, 312 Kan. at 573-74. A *Bernhardt* instruction explains that premeditation can "form during or after an initial altercation." *State v. Bernhardt*, 304 Kan. 460, 472, 372 P.3d 1161 (2016). *Stanley* observed that a district court giving a *Bernhardt* instruction should also specify that "[p]remeditation requires more than mere impulse, aim, purpose, or objective. It requires a period, however brief, of thoughtful, conscious reflection and pondering—done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions." 312 Kan. 557, Syl. ¶ 7.

We considered and rejected this very argument in two recent cases. See *Coleman*, 318 Kan. at 313-14; *Hilyard*, 316 Kan. at 332-37. Like Dotson, the defendants in those cases urged us to "take a step beyond *Bernhardt* and *Stanley* and hold a trial judge errs by

not giving an expanded premeditation instruction, even if not requested to do so at trial." *Coleman*, 318 Kan. at 313. We declined to do so because the pattern instruction on premeditation "'is legally sufficient and generally not likely to mislead the jury.'" 318 Kan at 313-14; see *Hilyard*, 316 Kan. at 334 ("[T]here is no error for an appellate court to correct" when "[t]he instructions given were sufficient, meaning that they properly and fairly stated the law and were not reasonably likely to mislead the jury."). As we explained, "it is immaterial" that "another instruction, upon retrospect, was also legally and factually appropriate, even if such instruction might have been *more* clear or *more* thorough than the one given." 316 Kan. at 334. This authority forecloses Dotson's challenge.

### B.   *A Verdict Form that Lists "Guilty" First Is Not Legally Erroneous*

Dotson argues the district court erred by placing "guilty" before "not guilty" on the verdict forms for both counts. Our court has repeatedly considered and rejected that argument. See, e.g., *Fraire*, 312 Kan. at 795-96; *State v. Wilkerson*, 278 Kan. 147, 159, 91 P.3d 1181 (2004). Dotson contends that our court wrongly decided those cases. But like the defendant in *Fraire*, Dotson "makes no showing at all that the order in which the verdict form presents the options has any bearing on the likelihood of a jury reaching one verdict or the other." 312 Kan. at 796. As a result, "[t]he verdict form presents no error of law." 312 Kan. at 797.

### C.   *The District Court Gave an Instruction on Imperfect Self-Defense*

Under K.S.A. 2018 Supp. 21-5405(a)(4), a person commits involuntary manslaughter when he or she kills a person "during the commission of a lawful act in an unlawful manner." A defendant might seek an instruction on that offense when the

24

defendant argues he or she killed someone while lawfully defending themselves but used excessive force. *State v. James*, 309 Kan. 1280, 1302, 443 P.3d 1063 (2019). Hence, an *imperfect* self-defense instruction.

Dotson contends the district court should have given that instruction here. The problem with that argument is the court *did* instruct the jury on imperfect self-defense. That said, the instruction contained an obvious typo: the court told the jury that to establish the charge of involuntary manslaughter, the State needed to prove "[t]he killing was done in the commission of an *unlawful* act in an unlawful manner." (Emphasis added.) That instruction was incorrect because imperfect self-defense under K.S.A. 2018 Supp. 21-5405(a)(4) occurs when a defendant kills a person "during the commission of a *lawful* act in an unlawful manner." (Emphasis added.) But Dotson did not object to that language at trial. His trial counsel also explicitly drew the jury's attention to the instruction, correctly stated the law, and explained how it applied to the facts. And in any event, Dotson has not argued on appeal that the imperfect-self-defense instruction misstated the law—his only argument is that the instruction was not given at all. Thus, we reject this challenge. See *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021) (issues not briefed are considered waived or abandoned).

D. *Dotson Has Not Shown that the Voluntary Manslaughter Instruction Was Erroneous*

The district court instructed the jury on voluntary manslaughter—it said that to establish that charge, the State had to prove Dotson "knowingly killed Ronald Marks, Jr." and that "[i]t was done upon a sudden quarrel." Voluntary manslaughter under K.S.A. 21-5404(a)(1) occurs when a defendant "knowingly kill[s]" a person "[u]pon a sudden quarrel or in the heat of passion." Dotson appears to argue that the district court should have expressly referenced "heat of passion" in the instruction.

25

But even if this broader language would have been legally and factually appropriate—something Dotson makes only a cursory argument for—we explained above that a district court does not err just because it failed to give a legally and factually appropriate instruction. See *Hilyard*, 316 Kan. at 334-36. Instead, the defendant must show that the instructions given were insufficient because they failed to "properly and fairly state[] the law" or were "reasonably likely to mislead the jury." 316 Kan. at 334. Dotson does not explain why the voluntary manslaughter instruction given at trial was insufficient. Furthermore, Dotson failed to request the heat-of-passion language during the instruction conference, and he did not object to the district court's instruction. So even if the district court erred, Dotson would need to establish clear error—that is, he would have the burden to "firmly convince[] us that the jury would have reached a different verdict" if the district court had given the instruction. *State v. Shields*, 315 Kan. 814, 821, 511 P.3d 931 (2022). Dotson has not made that argument either. We therefore reject this final instructional challenge. See *Davis*, 313 Kan. at 248 (issues not briefed are considered waived or abandoned).

V. *Our Precedent Forecloses Dotson's Identical-Offense Challenge*

Dotson next argues that under our court's caselaw, premeditated first-degree murder is identical to intentional second-degree murder, so the district court needed to sentence him for that lesser offense under the identical-offense doctrine. See *State v. Shelly*, 303 Kan. 1027, 1052, 371 P.3d 820 (2016) (under identical-offense doctrine, when "'two offenses have identical elements, an offender can be sentenced to only the less severe penalty applying to the two offenses'"). But in *Stanley*, our court affirmed its prior caselaw and held that "[p]remeditated first-degree murder and intentional second-degree murder are not identical, and the identical offense sentencing doctrine does not apply." 312 Kan. 557, Syl. ¶ 2. Dotson asserts that *Stanley* was wrongly decided, but he does not advance any argument to support this assertion. Thus, we reject his challenge.

VI. *Cumulative Error Did Not Deprive Dotson of a Fair Trial*

Lastly, Dotson alleges cumulative error deprived him of a fair trial. But the only error we identified above was the prosecutors' minor misstatement about the temporal component of premeditation. The cumulative-error doctrine does not apply when only one error has been identified. *State v. White*, 316 Kan. 208, 217, 514 P.3d 368 (2022).

For the reasons discussed above, Dotson has failed to establish any trial error warranting reversal of his convictions for first-degree murder and aggravated battery. Sufficient evidence supported Dotson's first-degree murder conviction. The prosecutors' misstatements of the law were harmless beyond a reasonable doubt. Dotson failed to establish that he received constitutionally ineffective assistance at trial. The jury instructions were not erroneous. Premeditated first-degree murder and intentional second-degree murder are not the same offense. And the cumulative-error doctrine does not apply. We therefore affirm Dotson's convictions.

Affirmed.