IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,839

STATE OF KANSAS,
*Appellee,*

v.

SAUL VALENCIANA,
*Appellant.*

SYLLABUS BY THE COURT

1.

The elements of premeditated murder and the definition of premeditation found in PIK Crim. 4th 54.150 have been repeatedly approved by this court as not being misleading and as accurately stating the law of premeditation. When the facts justify the giving of either a whole or partial *Bernhardt* instruction, all of a *Stanley* instruction must also be given, because a *Bernhardt* instruction, on its own, does not adequately explain the law of premeditation without potential juror confusion.

2.

A voluntary manslaughter instruction is factually appropriate when the evidence demonstrates an intentional killing and a legally sufficient provocation. Whether provocation is legally sufficient is based on an objective standard of whether it would deprive a reasonable person of self-control and cause that person to act out of passion rather than reason.

3.

We review claimed prosecutorial errors in two steps. First, we consider whether the prosecutor exceeded their wide latitude in conducting the State's case. We do not

1

consider any statement in isolation, but look instead to the context to determine whether an error occurred. Second, if error is found, the State must show that there is no reasonable possibility that the error contributed to the verdict. We may consider the district court's jury instructions and the strength of the evidence against the defendant in determining whether any prosecutorial error is harmless. But the strength of the evidence is not our primary focus, and we may find prejudice even in strong cases. We do not require parties to contemporaneously object to claimed prosecutorial errors to preserve them for appeal, although we may consider whether the parties objected as we assess each error.

4.

We review a district court's decision to deny a motion for mistrial for an abuse of discretion. Judicial discretion is abused if the court's action is arbitrary, fanciful, or unreasonable; based on an error of law; or based on an error of fact. The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion.

5.

K.S.A. 21-6810(d)(9) requires reckless criminal threat convictions to be excluded from criminal history scores because this court has found that portion of the criminal threat statute to be unconstitutional.

Appeal from Sedgwick District Court; JEFFREY GOERING, judge. Oral argument held January 26, 2026. Opinion filed May 22, 2026. Affirmed in part, vacated in part, and remanded with directions.

*Kristen B. Patty*, of Wichita, argued the cause and was on the brief for appellant.

*Julie A. Koon*, assistant district attorney, argued the cause, and *Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

WALSH, J.: Saul Valenciana raises six issues in this direct appeal relating to jury instructions, prosecutorial error, the district court's denial of his mistrial motion, cumulative error, and his criminal history at sentencing. Upon consideration, we conclude that the district court's instruction on premeditation was erroneous, but the error was harmless. Finding no other error, we affirm the convictions. We agree with Valenciana, however, that the district court erred when finding his criminal history score. Thus, we remand to the district court for resentencing.

FACTS AND PROCEDURAL BACKGROUND

On December 7, 2022, the State charged Saul Valenciana with one count each of premeditated first-degree murder, burglary, and theft in connection with the killing of Brent Boone. Valenciana's girlfriend, Tehya Turner, was charged as a codefendant.

As a teen, Turner had a relationship with Boone involving drug use and sexual activity. When she learned that Boone had surreptitiously recorded one of their sexual encounters and showed it to another person, Turner ended the sexual nature of the relationship.

When she later began dating Valenciana, Turner told him about the video Boone had made, which had affected her negatively and made it difficult for her to be intimate with Valenciana. Valenciana said he did not want to hear about Turner's past sexual partners, nor did he want to meet those individuals.

Nevertheless, on the Tuesday before Thanksgiving, November 22, 2022, Turner introduced Valenciana to Boone and the three used drugs together at Boone's house.

3

The next day, November 23, Turner went back to Boone's residence alone. She gave Boone a ride and he left his pistol in the backseat. That evening, Turner told Valenciana she had been with Boone and that she had his pistol. Turner would later say that Valenciana "didn't seem angry about it, but [she] knew he wasn't happy about it."

The following day, Valenciana and Turner attended four family Thanksgiving parties. During these parties, they both drank alcohol and smoked marijuana and methamphetamine. Toward the end of the parties, Valenciana was drunk and acting "extra happy" or "loud."

Later that evening, the duo headed to Boone's house. Boone had invited Turner and Valenciana to stop by if they were free on Thanksgiving. It was Valenciana's idea to visit Boone. Turner drove, and the ride was abnormally quiet. She tried to turn on some music, but Valenciana shut it off. Turner would later say that the two had not discussed the sex tape at all that night, and Turner did not know that Valenciana had a knife.

Boone and a friend, Joshua Knox, observed Turner and Valenciana's arrival through various security cameras installed at Boone's residence. Turner was driving and Valenciana was in the passenger seat.

Valenciana walked to Boone's front door and spoke with Boone, who then followed Valenciana back to the car. Valenciana directed Boone to get in the passenger seat, and Valenciana got in behind him, in the rear passenger seat.

Once inside the car, Turner and Boone began arguing about the gun. Then, from the backseat, Valenciana asked Boone what Boone had done to Turner—referring to the sex tape. Boone denied doing anything. Valenciana put a knife to Boone's throat and asked again. When Boone again denied wrongdoing, Valenciana slit Boone's throat all

4

the way across. Boone, still alive, began screaming, gargling, and slumping over. Turner drove away while Valenciana restrained Boone from the backseat and continued to stab him multiple times.

At some point Valenciana and Turner switched seats, and Valenciana drove to a rural area in Sumner County where they dumped Boone's body.

They then went to a property near Haysville, where acquaintances allowed them to stay for several days. During this time, they cleaned the vehicle used in the killing by removing and burning the blood-soaked interior materials and seats, which they replaced. They borrowed a different vehicle from the acquaintances and, in the early hours of the morning on November 29, they broke into Boone's house through a window AC unit and took some items, including parts of Boone's home security system, all of which was captured on a neighbor's surveillance footage.

Valenciana and Turner split up in the ensuing days. She told an acquaintance that she was fearful of Valenciana, and that he had slit someone else's throat "to prove his love to her." She was arrested and recounted the events surrounding the murder to police in an interview, which was played for the jury.

Investigators eventually found Boone's body on December 2. Valenciana was involved in a standoff with Wichita SWAT but was ultimately taken into custody on December 15.

At trial, Valenciana conceded that he killed Boone but argued the killing was not premeditated. The coroner testified that Boone had suffered at least 13 externally observable sharp force injuries. He could not say which was the lethal blow, but that blood in the lungs revealed Boone had continued to breathe after some of the injuries were inflicted.

5

Valenciana did not testify in his defense.

During the jury instruction conference, the parties discussed the appropriate language for the premeditation instruction and the district court denied Valenciana's request for a voluntary manslaughter instruction. Valenciana moved for a mistrial following closing arguments, which the district court denied.

The jury found Valenciana guilty on all counts, and the district court sentenced him to life imprisonment for the premeditated murder conviction, 31 months for the burglary conviction, and 12 months in county jail for the theft conviction. Over Valenciana's objection, the district court found his criminal history score was B based on its inclusion of a criminal threat conviction as an adult person felony.

This is Valenciana's direct appeal. Jurisdiction is proper. K.S.A. 22-3601(b)(3) (Supreme Court has jurisdiction over life imprisonment cases); K.S.A. 22-3601(b)(4) (Supreme Court has jurisdiction over off-grid crimes); K.S.A. 21-5402(b) (first-degree murder is an off-grid crime).

ANALYSIS

1. *The district court erred in defining premeditation for the jury, but the error was harmless.*

Both the State and defense counsel initially proposed jury instructions that simply included the elements of premeditated murder and the definition of premeditation found in PIK Crim. 4th 54.150, which have been repeatedly approved by this court as not being misleading and as accurately stating the law of premeditation. *State v. Barnes*, 320 Kan. 147, 174, 563 P.3d 1255 (2025).

6

Defendant later requested certain language drawn from *State v. Stanley*, 312 Kan. 557, 478 P.3d 324 (2020), and the State requested some language from *State v. Bernhardt*, 304 Kan. 460, 464, 372 P.3d 1161 (2016). The district court proposed a compromise, and the parties engaged in a lengthy discussion culminating in defendant ultimately objecting to all language other than the PIK language and a final line indicating the jury had to determine when the final act of killing occurred.

The relevant portion of the instruction given to the jury over defense counsel's objection defined premeditation as thinking the matter over beforehand and stated that it requires more than an instantaneous intentional act. It further explained that premeditation can occur during a struggle and requires a period, however brief, of conscious reflection before the final act of killing. The court also instructed the jury that it must determine what constituted the final act of killing.

Specifically, the premeditation instruction included the PIK instruction (in plain type), portions of the *Bernhardt* instruction (in *italics*), portions and a slight rewording of the *Stanley* instruction (in **bold**), and some other language (underlined):

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life. *Premeditation does not have to be present before a fight, quarrel or struggle begins. Premeditation can occur during the middle of a violent episode, struggle or fight.*

"Premeditation is the process of thinking about a proposed killing before engaging in homicidal conduct; that is, **it requires a period, however brief, of thoughtful, conscious reflection and pondering done before the final act of killing.**

"It is for you to determine what the final act of killing was." (Emphasis added.)

7

On appeal, Valenciana argues that the district court's instruction to the jury defining premeditation was legally inappropriate because, although it incorporated portions of language approved in *Bernhardt* and *Stanley*, it omitted language from *Stanley* clarifying that premeditation requires more than mere impulse and must involve reflection sufficient to allow the defendant to abandon the intent to kill.

We agree.

When a district court supplements the pattern instruction on premeditation with *Bernhardt* language addressing the timing of premeditation, it must also provide a complete *Stanley* instruction to ensure jurors understand the distinction between intent and premeditation. See *State v. Romey*, 321 Kan. 400, 411, 580 P.3d 1 (2025) ("[A] *Stanley* instruction is required when the district court provides a *Bernhardt* instruction."); 321 Kan. 400, Syl. ¶ 3 ("When giving a *Bernhardt* instruction clarifying the temporal aspect of premeditation, the court *must* also give a *Stanley* instruction." [Emphasis added.]). A partial *Stanley* instruction—like a *Bernhardt* instruction standing alone—risks juror confusion by failing to fully convey the required cognitive component of premeditation.

Here, the district court included language describing reflection but omitted *Stanley*'s clarifying requirement that premeditation involves more than impulse and must allow time to change course. Because the instruction did not fully and accurately state the law, it was legally inappropriate.

The error, however, was harmless.

The jury was presented with substantial evidence that could support a finding of premeditation. Evidence suggested that Valenciana was upset about the sex tape; he

8

proposed going to Boone's house and acted strangely on the drive; he had, unbeknownst to Turner, brought a knife with him; he maneuvered Boone into a vulnerable position in the seat in front of him; inflicted a significant throat wound; continued to stab Boone after he was incapacitated; and attempted to cover up the crime.

Thus, although the instruction given did not fully set forth the law of premeditation, the jury had abundant evidence to conclude that Valenciana thought the matter over beforehand before killing Boone. We are satisfied that there is no reasonable probability that the error affected the verdict.

2. *The district court did not err in declining to instruct on heat of passion voluntary manslaughter.*

Valenciana next argues the district court erred by denying his request for a heat of passion voluntary manslaughter instruction based on K.S.A. 21-5404(a)(1).

The statute defines voluntary manslaughter as "knowingly killing a human being committed[] [u]pon a sudden quarrel or in the heat of passion." K.S.A. 21-5404(a)(1). The requested instruction focused on the "heat of passion" language. See *State v. Wade*, 295 Kan. 916, 924, 287 P.3d 237 (2012) (observing "that a sudden quarrel is not separate and apart from heat of passion, but rather it is simply" a type of provocation for heat of passion). "The core elements of voluntary manslaughter are an intentional killing and a legally sufficient provocation." *State v. Gallegos*, 313 Kan. 262, 267, 485 P.3d 622 (2021).

Because the issue was properly preserved for appeal, we turn to the second step in our error analysis: legal appropriateness. The parties correctly agree that the instruction was legally appropriate. See *Gallegos*, 313 Kan. at 266-67 (setting out three-step process

9

for analyzing jury instruction issues, noting voluntary manslaughter is a legally appropriate lesser offense instruction of first-degree murder).

Moving on, a voluntary manslaughter instruction is factually appropriate when the evidence demonstrates an intentional killing and a legally sufficient provocation. Whether provocation is legally sufficient is based on an objective standard of whether it would deprive a reasonable person of self-control and cause that person to act out of passion rather than reason. *Gallegos*, 313 Kan. at 267.

In *Wade*, this court explained "heat of passion" means "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action.' The hallmark of heat of passion is taking action upon impulse without reflection. [Citation omitted.]" *Wade*, 295 Kan. at 925. A qualifying provocation "must be substantial enough to cause an ordinary person to lose control of their actions and reason." *Romey*, 321 Kan. at 413.

"'Whether sufficient provocation exists requires an objective determination of whether a reasonable person would lose self-control under the facts presented such that the person acts from extreme emotion rather than reason, regardless of the subjective belief of the defendant.'" *Romey*, 321 Kan. at 413 (quoting *State v. Thille*, 320 Kan. 435, Syl. ¶ 3, 570 P.3d 18 [2025]); *State v. Uk*, 311 Kan. 393, 398, 461 P.3d 32 (2020) ("In other words, while the district court employs a gatekeeper function, it is limited to determining whether a purported incident—the existence of which is evaluated in a light most favorable to the defendant—rises to the objective *legal* threshold of sufficient provocation.").

"A slow burn is not heat of passion." *Wade*, 295 Kan. at 926. In *Wade*, the court observed that the instruction was not factually appropriate because evidence indicated Wade's anger had started to build in the days leading up to the shooting. 295 Kan. at 926.

10

And Wade armed himself before driving to the residence where the murder occurred, further undermining his claim.

Here, as in *Wade*, there was evidence that Valenciana's anger about the video began to build in a slow burn in the days prior to the murder, as well as on the way to Boone's residence. Valenciana had the murder weapon during the drive and was acting abnormally quiet. And Valenciana directed Boone into the seat in front of him. See *Gallegos*, 313 Kan. at 269 ("Gallegos' meeting with M.C. was not an unforeseen or abrupt encounter, rather it was methodically planned.").

The only provocation Valenciana points to is Boone's repeated denial of knowledge about the sex tape. Though this may have been offensive, "[m]ere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter." *Gallegos*, 313 Kan. at 269 (quoting *State v. Gentry*, 310 Kan. 715, 722, 449 P.3d 429 [2019]).

We conclude the district court properly exercised its gatekeeper function, and there was no error in denying the requested instruction as factually inappropriate because the asserted provocation was insufficient to make an objectively reasonable person lose control.

3. *The prosecutor did not commit error in closing.*

Valenciana claims the prosecutor erred in describing premeditation during closing argument. Our standard of review is a familiar one:

> "We review claimed prosecutorial errors in two steps. First, we consider whether the prosecutor exceeded their wide latitude in conducting the State's case. We do not

11

consider any statement in isolation, but look instead to the context to determine whether an error occurred.

"Second, if error is found, the State must show that """there is no reasonable possibility that the error contributed to the verdict.""" We may consider the district court's jury instructions and the strength of the evidence against the defendant in determining whether any prosecutorial error is harmless. But the strength of the evidence is not our primary focus, and we may find prejudice even in strong cases.

"We do not require parties to contemporaneously object to claimed prosecutorial errors to preserve them for appeal, although we may consider whether the parties objected as we assess each error. [Citations omitted.]" *State v. Bobian*, 321 Kan. 169, 182, 574 P.3d 385 (2025).

During closing argument, the prosecutor reiterated the definition of premeditation provided in the jury instructions. The prosecutor discussed the murder weapon and the close range of the attack, Turner's testimony that Boone was not dead after the throat cutting, the coroner's testimony that Boone had aspirated blood in his lungs, the additional stab wounds, and the coroner's testimony that he could not identify a particular blow that caused death. Then the prosecutor said the following:

"When you determine what is the final act of killing, ask yourselves this, did he stop at Wesley Hospital, which is not too far from where he was? Did he stop at St. Joseph Hospital? Again, not too far from where he was. Did he stop anywhere? Did he call 911? Did he seek medical attention for Brent, or did he just let him die as he intended?

"And then he disposed of Brent's body. Well, what does that tell you? How does that affect premeditation? Well, again, it goes to his thought ladies, and gentlemen. He made a fairly rapid decision, let's get out of here. Let me drive. Let me drive us out somewhere. And he drove out in the country at high speeds. Well, he must have been hallucinating. Well, he was trying to dispose of the evidence. He didn't wreck his car. He found a place that was secluded. He didn't mess up and dump him in a city block inside

12

the city limits. He took him to a place where nobody would find him, and where the animals could dispose of the evidence.

"And then he cleaned up after. Well, that doesn't speak to premeditation. Doesn't it, though? He doesn't stop and say, oh, my God, what have I done? I need to call and say something is wrong here. Instead, he goes and he cleans it up and tries to compound the crime. And then he avoids law enforcement for several days. Ultimately, a SWAT team has to be called out to get him to come out of the house, all because he has a guilty conscience. He knows what he's done.

"Premeditation cannot happen in an instant, but no specific time period is required. You have plenty of time for him to have thought the matter over beforehand. I would suggest the evidence here, ladies and gentlemen, is he was thinking about doing this the entire time. From the time they left the apartment out in Maize or by Maize, he had this in his mind he was just looking for that last reason to do what he did."

The prosecutor came back to this type of analysis a little later on:

"Ladies and gentleman, the defendant had . . . several opportunities to make different decisions, many opportunities to stop this, many opportunities to keep Brent alive. He could have stopped before he put the knife to his throat. He could have stopped before he slid the knife across his throat. He could have stopped at a hospital. He could have stopped to help. Instead, he put a sheet around him—or a shirt around him to hold him up so he wouldn't bleed all over. And then he inflicted additional stab wounds, some of which may have been what, ultimately, killed him."

In rebuttal, the prosecutor outlined the relevant factors that support an inference of premeditation outlined in *Bernhardt*. The prosecutor then considered how the evidence supported these factors, and went on:

"And then you have all the conduct that happened afterwards, he waited for Brent to die. And then he drove out of county, he dumped his body, and then came back and they cleaned up the car.

13

"Threats and declarations of the defendant before and during the occurrence, after Brent said I can't move, what did the defendant say to him, you fat mother fucker, as he repeatedly stabbed him, after slitting his throat. Dealing the lethal blows after the deceased was felled and rendered helpless, again, evidence premeditation. That one slit to the throat wasn't enough, because Brent was still talking. Tehya Turner testified about that. He, repeatedly, continued to stab Brent 13 times. We have, at least, according to Dr. Gorrill, 13-different sharp force injuries that all contributed to Brent's death, 13. The one to the neck, not enough. I'm going to keep stabbing until your [*sic*] dead."

Valenciana asserts that these statements misstate the law of premeditation. We conclude, however, that the comments were not error.

The prosecutor began by explaining the jury instruction and then discussing how the facts of the case were relevant to the premeditation question. Further, in rebuttal, the prosecutor specifically identified factors that this court has noted as relevant to the premeditation inquiry: "(1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, and (5) the dealing of lethal blows after the deceased was felled and rendered helpless." *State v. Dotson*, 319 Kan. 32, 38, 551 P.3d 1272 (2024). The prosecutor then discussed those factors and the evidence presented at trial. And it is not error to discuss how the evidence supports the State's theory. *State v. J.L.J.,* 318 Kan. 720, 731-32, 547 P.3d 501 (2024).

Kansas caselaw is clear that premeditation can be inferred from circumstantial evidence, which would include Valenciana's conduct after the killing and, assuming it is true that Boone would have inevitably died after having his throat slit, premeditation can also be inferred from the dealing of lethal blows *after* Boone was felled and helpless, which could likely include the additional stabbings as Boone sat in the vehicle and gargled. We acknowledge Valenciana's stated concern with "back-dat[ing]"

14

premeditation. But taken in context, the prosecutors' closing argument and rebuttal appropriately walked through the law of premeditation and discussed the evidence relevant to that law. We conclude the prosecutors did not commit error.

4. *The district court did not abuse its discretion in denying the motion for mistrial.*

Valenciana next argues the district court abused its discretion when denying his motion for a mistrial based on the prosecutor's use of the phrase "heat of passion" in closing argument. He argues, and we agree, that because the mistrial motion was based on alleged prosecutorial error and a contemporaneous objection is not required, the arguments related to the State's use of particular terms in closing are preserved for appeal. However, there was no constitutional argument presented below, and to the extent Valenciana purports to make one here, it is not properly before this court. See *Stanley*, 312 Kan. at 560-61 (finding a mistrial claim unpreserved because the argument below differed from the argument on appeal).

A few additional facts are necessary to understand the basis for the motion. During the jury instruction conference, defense counsel asked:

> "I need to put this in the record. I get the analysis of the voluntary manslaughter, heat of passion. I think, that goes more towards whether or not it's a lesser included. We're saying that this is our theory of defense. We started this voir dire. We mentioned it opening. We have been discussing this, and trying to lay the evidence during the evidentiary phase. I get your ruling that you're not going to give voluntary manslaughter. But I'm asking for clarification here, because we still believe that we can argue heat of passion, in the context of a lack of premeditation or whether or not there's an intent to kill.

> "Now, maybe we're not going to have the legal ability to say find him guilty of voluntary manslaughter. But I do believe we can still argue our theory of defense, that

there was voluntary intoxication and this heat of passion, causing him not to form premeditation, that it goes to something that's spontaneous, instantaneous, and impulsive.

"Do we have that legal ability in your ruling?"

As to this question, the prosecutor chimed in:

"I agree they can argue that he was spurred by some heat of the moment decision making, and that's why this is a second intentional and not a premeditated murder. I don't have a problem with them arguing that he was prompted by this heat of the moment. I will object, most likely, if they try to define a heat of passion and give a legal definition, or refer to it as a legal thing. But if they want to argue that this was in the heat of the moment, they're entitled to do that."

After discussing other issues, defense counsel again sought clarification on the heat of passion issue:

"[Defense counsel]:  So I understand what you're saying, we're not precluded from arguing voluntary intoxication and heat of passion as to intent to kill?

"The court:  Yeah. If you want to say that his mental state was such that he had too much to drink, smoked too much meth, whatever, and this incident that occurred in the car—that this whole thing happened without intent, because of the combination of things. I think we're going to draw an objection from the State, as if you use the term heat of passion, or try to define it in some way. I think, you can describe the circumstances of what happened that night, probably, without using those terms and effectively present your argument.

"[Defense counsel]:  As a spontaneous, impulsive, emotional excitement?

"The court:  Yeah.

16

"[Defense counsel]:   Okay. If that's the case, you're going to have to give us some time this morning to alter this PowerPoint closing, because I need to take out some things."

During closing argument, the prosecutor used the term "heat of passion" and discussed provocation after outlining the arguments in support of premeditation:

"I'm sure counsel will talk to you about, well, he was having heat of passion. He was being of actions, right? He was responding to an instantaneous decision, because he was so upset. Ask yourselves this, what was he upset at when he said what did you do? Brent said, nothing, she took my gun. He didn't provoke. He didn't cause a reaction. He was waiting to react. It didn't matter what Brent said, he was going to react. Brent could have said, yeah, I took a videotape of her when I was—when she was younger. I'm sorry I did that. It didn't matter. He said I didn't do anything, she took my gun. And that's the provocation he needed to be judge, jury, and executioner, a denial resulted in Brent's death?"

Without saying the words, defense counsel's closing argument included heat of passion-type arguments. For example, counsel's argument began with:

"Good morning. Well, that's where we disagree. This isn't about what happened. It's about why it happened. You need to consider that in the context of your deliberations. What does the evidence show? The evidence proved beyond a reasonable doubt that Saul Valenciana killed Brent Boone during a confrontation about Brent's sexual exploitation of Tehya, while Saul was in a state of extreme emotional excitement and under the influence of methamphetamine and alcohol."

Defense counsel then continued, noting the motive for the killing was "as old as the Bible" and spent some time outlining an analogy where a young woman caused "the male to act upon an extreme emotional impulse, rather that [*sic*] reasoning." After telling the tale, counsel noted it illustrated "that as old as the Bible, this story of what happened

17

on November 24, 2022, involves the same theories. He had emotional anger, manipulation, extreme emotional excitement, impulse, emotional reaction without any reason."

In rebuttal argument, the prosecutor referenced provocation several times.

Following arguments, defense counsel moved for a mistrial, based on the prosecutor's claim that there was no provocation or heat of passion. Specifically, defense counsel said:

"I want to put this on the record. During closing, we were told we couldn't mention heat of passion, provocation. [The first prosecutor] gets up there and talks about heat of passion, provocation. [The second prosecutor] gets up there and talks a lot about provocation, a lack of provocation for this fight, that Tehya Turner had said there was no fight, there was no self defense. We were precluded from arguing heat of passion or sufficient provocation, and yet their [*sic*] allowed to argue that, so I object. It completely under minds [*sic*] our defense. We were told we can't even respond to that or say the words.

"So I don't know what to do, other than to just object about that. And that it's, fundamentally, unfair for us to have our entire defense cut out from underneath us. And yet, in closing argument that's what they're doing, and end around it saying that there's no heat of passion and there's no provocation."

The court asked for the State's response, which was as follows:

"Judge, you didn't issue an order that they could not talk about the idea of heat of passion. I think what you said was, that can't attempt to define heat of passion. It's a legal definition, which is a true statement. We were not allowed to give legal definitions, because you're the decider of the law. I talked about a lack of provocation, certainly, because they said they were going to talk about provocation for why this was something less than first-degree, premeditated murder. And to try and argue that this was an

instantaneous decision. [The second prosecutor], in rebuttal talked about the Bernhardt factors, one of which is lack of provocation. So provocation is not a word that is solely tied to the definition of heat of passion. There was nothing improper about it in the argument."

Defense counsel replied that there was an off the record discussion between the judge, one of the prosecutors, and defense counsel, where the judge and the prosecutor said defense counsel could not "utter the words heat of passion." Counsel also noted that "we never said after the jury instruction conference that we're going to argue provocation." Because of this, defense counsel moved for a mistrial.

The prosecutor responded that any off the record discussion was not memorialized and the prosecutor responding was not present during any discussions. He reiterated that the record showed the district court said defense counsel could not *define* heat of passion. Because of this, "[t]here is, literally, nothing—no violation of your orders."

The district court then ruled in reply:

"Well, I sat through, obviously, with everyone else, the closing arguments. I think the defense has made a very good argument on behalf of Mr. Valenciana that the jury should find that this an incident that lacked premeditation. And I think that the State's discussion in its closing argument has not harmed the defense of its case, to the point where a mistrial is required. So the Court will deny the mistrial, and note the arguments for the record."

*Standard of Review and Discussion*

K.S.A. 22-3423(1)(b) permits a district court to order a mistrial when "there is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law" and defendant requests or consents to the declaration of

mistrial. Subsection (1)(c) of the same statute permits a mistrial where "prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution."

We review a district court's decision to deny a motion for mistrial for an abuse of discretion. Judicial discretion is abused if the court's action is arbitrary, fanciful, or unreasonable; based on an error of law; or based on an error of fact. The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *State v. Butler*, 321 Kan. 493, 506, 581 P.3d 1261 (2026).

Valenciana argues "[t]he trial court decreed that references to 'heat of passion' were off-limits, and the prosecutors violated that order." The State contends the district court never ordered the parties to not say "heat of passion." Although the district court's ruling is not a model of clarity, our review of the record as a whole suggests the State is correct.

The record indicates the court only cautioned defense counsel against defining heat of passion or provocation. In fact, defense counsel asked if it was correct that counsel was "not precluded from arguing voluntary intoxication and heat of passion as to intent to kill" and the court responded, "Yeah." In the same breath, the court went on to say defense counsel would likely draw an objection if counsel used the term heat of passion or tried to define it. This seems to be in reference to the prosecutor's prior statement that they did not have a problem with defense counsel arguing "he was prompted by this heat of the moment" but further noting "I will object, most likely, if they try to define a heat of passion and give a legal definition, or refer to it as a legal thing." Thus, the court's initial ruling seemed to indicate it was not barring anyone from saying the terms while also noting a potential objection could arise.

20

We empathize with defense counsel's frustration at what appears to have been a misunderstanding about the district court's directive. But even without using the terms "heat of passion" or "provocation," Valenciana was fully able to—and did—argue his theory of defense to the jury. There simply was no legal defect or prejudicial conduct that would justify a declaration of mistrial, thus there was no error in the district court's denial of Valenciana's motion.

5. *Cumulative error analysis is inapplicable.*

Because we have identified only one error and have concluded it was harmless, the cumulative error doctrine does not apply. *State v. Mendez*, 319 Kan. 718, 742, 559 P.3d 792 (2024).

6. *Valenciana must be resentenced.*

Valenciana's final argument is that the district court erred by including his prior criminal threat conviction as part of his criminal history score. We agree.

Last year, in *State v. Smith*, 320 Kan. 62, 90-91, 563 P.3d 697 (2025), we answered "no" to the question of whether reckless criminal threat convictions could be included in Kansas criminal history scores. As we explained in *Smith*, K.S.A. 21-6810(d)(9) requires reckless criminal threat convictions to be excluded from criminal history scores because this court found that portion of the criminal threat statute unconstitutional in *Boettger*. Under our literal reading of K.S.A. 21-6810(d)(9), any potential doubt cast on that holding by the United States Supreme Court's decision in *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023), "is irrelevant." *Smith*, 320 Kan. at 91. As such, the district court's inclusion of the reckless criminal threat conviction in Valenciana's criminal history score was error.

The State concedes the error under *Smith* but argues that *Smith* was erroneously decided and should be overturned. We disagree. We previously rejected similar arguments made by the State in its motion requesting rehearing or reconsideration of *Smith*, and we will not revisit them here. Accordingly, we remand to the district court for resentencing.

Affirmed in part, vacated in part, and remanded for resentencing.

LUCKERT, J., not participating.